*In re* MARRIAGE OF JANET R. ATKINSON, a/k/a Janet Goelz, Petitioner-Appellee, and JOHN F. ATKINSON, a/k/a Jeff Atkinson, Respondent-Appellant.

First District (4th Division)   Nos. 79-610, 79-1749 cons.

Opinion filed March 20, 1980.—Rehearing denied April 15, 1980.

Rinella & Rinella, Schiller & Schiller, and Jeff Atkinson, *pro se*, all of Chicago, for appellant.

Bentley & DuCanto, of Chicago, for appellee.

James T. Friedman, Ltd., of Chicago, guardian ad litem.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

The 10-year marriage of Janet R. Atkinson, a/k/a Janet Goelz, the petitioner, and John F. Atkinson, a/k/a Jeff Atkinson, the respondent, was

dissolved on October 5, 1978. The court subsequently conducted hearings on the question of custody of the parties' minor children, Tara and Abigail Atkinson, born in 1970 and 1972, and on the division of property. Custody was awarded to Janet Atkinson with rights of visitation to Jeff Atkinson. Janet Atkinson was also awarded certain property. Jeff Atkinson appeals from the awards of custody and property.

Preliminarily, Janet Atkinson questions the jurisdiction of this court to consider the custody judgment. That judgment was entered in January of 1979. A notice of appeal was filed within 30 days. Four months later, a judgment order distributing marital assets and setting child support and maintenance was entered. A notice of appeal from that judgment order was filed within 30 days. The latter notice of appeal did not mention the custody judgment. In October of 1979—8½ months after the first notice of appeal was filed and two months after Jeff Atkinson filed his initial appellate brief—Janet Atkinson filed a motion to dismiss the notice of appeal from the custody judgment. On appeal, Janet Atkinson argues that because the custody judgment was not appealable, the first notice of appeal had no effect. She further contends that because the second notice of appeal did not include the custody judgment, that issue is not before this court.

The lawsuit which is the subject of this appeal involves multiple claims including dissolution of the marriage, child custody and disposition of property. Under Supreme Court Rule 304(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 304(a)), where multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to fewer than all of the claims only if the trial court has made an express written finding that there is no just reason for delaying enforcement or appeal. No such finding was made here. Therefore, although the custody order was a final judgment, it was not appealable.

Nevertheless, we conclude that the interests of justice require that we consider the custody issue as well as the property issues. Jeff Atkinson was diligent in his efforts to perfect appeals as to both custody and property. There is no question but that Janet Atkinson had notice of his intent to appeal the custody issue, and she was less than prompt in her filing of the motion to dismiss the appeal from the custody issue. Under these circumstances, we conclude the custody judgment is reviewable. See *Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 394 N.E.2d 380.

The parties are each attorneys and are employed by Chicago law firms. At the custody trial, the trial court heard testimony from 16 witnesses and received two written psychological reports.

Diane Bolash testified that she has known the Atkinsons since 1975 when she became their babysitter. She said Jeff Atkinson probably spends

more time with the children but that Janet Atkinson also cares for them. According to Bolash, Janet Atkinson is an exceptional mother; both are good parents.

Louise Shief was employed until 1974 as a housekeeper by the parties. She was with the Atkinsons for more than four years including the time of the children's births. She testified Jeff Atkinson was the parent who stayed home to take care of the children, that he "was like the father and the mother at that time, because he was there most of the time." She said Jeff Atkinson bathed, fed and played with his daughters and took care of them when they were sick. She also said Janet Atkinson seldom stayed home when the children were ill. She described Janet Atkinson's involvement with her daughters as "playing with dolls." In Shief's opinion, the daughters were closer to their father than their mother.

Dr. Christel Lembke, a child psychiatrist who was the Atkinson's neighbor at the time of the trial, also testified that Jeff Atkinson has served as both mother and father to the children. She said both mothers and fathers are capable of nurturing young children. Dr. Lembke said Jeff Atkinson, as a father, was always available, very understanding and patient, and was able to spend time with children in a very constructive way.

Other neighbors also described Jeff Atkinson as spending a great deal of time with his daughters and having a warm and loving relationship with them.

Two of Tara's elementary school teachers testified on behalf of Jeff Atkinson. Both said Jeff Atkinson helped in the classroom and went on his daughter's field trips. Susan Rankin, Tara's first grade teacher, said Jeff Atkinson was a thoughtful, caring and interested parent when he was in her classroom. Kate Shapiro, Tara's second grade teacher, said the children in the classroom related well to Jeff Atkinson. Both teachers testified that their primary parental contact was with Jeff Atkinson.

Jeff Atkinson testified that from the time his daughters were born until the present he, rather than Janet Atkinson, took care of raising the children. He estimated that he took care of the girls at least two-thirds of the time and Janet Atkinson took care of them one-third of the time. He also said he did most of the meal preparations, grocery shopping, household errands and hiring of housekeepers and that he took the children to most of their doctor appointments.

During law school Jeff Atkinson said he came home between 3 and 4 p.m. most days while Janet Atkinson stayed late at school or engaged in other activities two to five nights per week. He also said that if his work demanded too much time away from his children he would seek a less time-consuming job.

Two of Janet Atkinson's friends testified for her. Mary Ann Wexler

had known the parties for six years. From 1972 to 1974 the Wexlers lived in the same apartment building as Jeff and Janet Atkinson. The Wexlers' primary relationship was with Janet Atkinson rather than Jeff Atkinson. Wexler said she thought Janet Atkinson was "a terrific mother" and that Janet Atkinson had no deficiencies in that role. She also said that Jeff Atkinson cared about his daughters a great deal and that the girls love him.

Carolyn Stock met Janet Atkinson in college 11 years prior to the trial. She said that Janet Atkinson is a caring, nurturing, warm and empathic mother. Jeff Atkinson is an active father but Stock believed he was too involved with his children; he does not give them enough independence.

Janet Atkinson's employer, a partner at her law firm, said she would be allowed to work part-time in her job.

On her own behalf Janet Atkinson testified that she was a fit parent, that she loved her children, and that they loved her. She acknowledged that Jeff Atkinson was a good father and that he was genuinely interested in his daughters' education. She said she planned to continue working and that she would employ a housekeeper to take care of the children.

The parties' then current housekeeper, Catherine Smith, testified that she had been working for the parties for slightly more than one year. She said that neither party was deficient as a parent and that both were "nice" parents. She said Jeff Atkinson had "a beautiful relationship with the children." Smith also said Jeff Atkinson generally came home from work before Janet Atkinson and that she left the house many evenings without seeing Janet Atkinson.

Upon the motion of the children's counsel, the court appointed an independent medical expert, Dr. Ner Littner. Dr. Littner is a board-certified psychiatrist and has written numerous articles on child psychiatry. The witness interviewed the parties and the children and also spoke to other persons who had knowledge of the family. Dr. Littner concluded Janet Atkinson was in relatively good shape emotionally; that she had some problems but had excellent maternal capacity. The psychological tests which were conducted by Dr. Traisman, at Dr. Littner's request, showed the presence of some emotional problems in Janet Atkinson. It also showed she was very interested in her children, has a genuine love for them, and is an adequate parent.

Dr. Littner said Jeff Atkinson also demonstrated some problems although perhaps not as marked as those shown by Janet Atkinson. Jeff Atkinson demonstrated good fatherly capacities. However, in Dr. Littner's opinion, he was trying to be a mother as well as a father to the children. Jeff Atkinson's efforts to be a "mother" were unhealthy. There is a risk that because of his "mothering," the children will grow up being

confused about what it means to be a man or a woman. Dr. Littner saw no evidence of harm to or confusion in Tara and Abigail as a result of Jeff Atkinson's "mothering," but he thought there was a potential for it to develop later. When asked the results of the psychological testing regarding Jeff Atkinson, Dr. Littner responded:

"It showed the same double situation; namely, the presence of some problems, a strong need for affection and recognition and gratification; feelings of depression; and a sense of loss within him; doubts about his adequacy and about his masculine security and his ability to obtain satisfactions of a lot of internalized angry feelings, and the ability to be a good father."

Dr. Littner appeared before the Academy of Matrimonial Lawyers at a time prior to the trial and there expressed an opinion relative to his belief concerning the custody of young female children. His opinion was that if the mother was truly the "mother" to the children, if she wanted the children, and if she were capable of looking after the children, then her young children are usually better off in her custody. Dr. Littner believes that certain bonds are established between a mother and her daughters during the first year of life where the mother assumes the mothering role, and that the breaking of those bonds in separating the children from their mother causes "a devastating amount of damage." Based on his conclusion that Janet Atkinson was the "basic mother" for the first year of Abigail's and Tara's lives, he believed that breaking those bonds would cause more damage than any positive benefits that could come from living with their father.

Tara was noncommittal with Dr. Littner concerning with which parent she preferred to reside, while Abigail was trying to be noncommittal but, in Dr. Littner's opinion, "her desire to live with her mother came through quite strikingly." Dr. Littner recommended that Janet Atkinson have custody of the children with liberal visitation rights for Jeff Atkinson.

Dr. Melvin Seglin, a board-certified psychiatrist, testified for Jeff Atkinson. Prior to testifying, Dr. Seglin interviewed Jeff Atkinson and the two daughters. He also reviewed the transcripts from the previous days of trial and the psychological reports on the parties. Janet Atkinson was not willing to talk to him.

Dr. Seglin testified that both girls expressed a preference to live with their father. However, Tara was reluctant to make a choice, and Dr. Seglin felt that anything Abigail would say was unreliable because of her lack of maturity. He also said that Jeff Atkinson was sensitive, well-adjusted, in good control and, on the basis of the psychologist's written reports, more stable than Janet Atkinson. He concluded that the best

interests of the children would be served by placing them in their father's custody.

Dr. Seglin commented on Dr. Littner's opinion that there was something unhealthy about a father assuming too much of a "mother's" role. He said Dr. Littner was applying a classical approach which was common in Sigmund Freud's era 80 years ago when the roles of mother and father were clearly delineated. Dr. Seglin said times have changed and that roles which were appropriate in earlier times are no longer applicable; there is now an interchangeability of roles.

The trial judge, in rendering his decision, commented that there were three factors which he might consider but that none was conclusive: (1) the amount of time each parent spent with the children; (2) the desires of the children; and (3) comments by the expert witnesses.

Jeff Atkinson makes a number of arguments on appeal concerning the custody order. He argues (1) the trial court erred by failing to make findings of fact as required by the Marriage and Dissolution of Marriage Act, (2) the trial court abused its discretion and made an error of law by awarding custody to Janet Atkinson, and (3) the custody order denied him due process and equal protection of the law under the Illinois and United States constitutions.

In arguing that the court erred by failing to make findings of fact, Jeff Atkinson relies on section 602(a) of the Marriage and Dissolution of Marriage Act which provides:

> "The court shall determine custody in accordance with the best interest of the child. The court *shall consider all relevant factors* including:
>
> (1) the wishes of the child's parent or parents as to his custody;
> (2) the wishes of the child as to his custodian;
> (3) the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interest;
> (4) the child's adjustment to his home, school and community; and
> (5) the mental and physical health of all individuals involved."
> (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 40, par. 602(a).)

Jeff Atkinson relies on *Wurm v. Wurm* (1979), 68 Ill. App. 3d 168, 385 N.E.2d 894, where the appellate court remanded the cause to the trial court because the judgment order was silent concerning the section 602 factors. In a more recent case, *In re Custody of Melear* (1979), 76 Ill. App. 3d 706, 395 N.E.2d 208, the appellate court distinguished *Wurm* and concluded:

> "We do not read either *Wurm* or the new marriage act as mandating a recital of the specified factors in the judgment order

or as requiring written findings of fact in any other form. (Citations.) What section 602 of the Act clearly *does* require is some indication in the record that the trial court considered the factors listed." *Melear*, 76 Ill. App. 3d 706, 708-09, 395 N.E.2d 208, 210.

The supreme court recently considered the necessity of findings of fact in the modification of custody judgments under section 610(b) of the Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1977, ch. 40, par. 610(b).) That section provides that a custody judgment shall not be modified unless the court *"finds"* that certain conditions exist. In *In re Custody of Harne* (1979), 77 Ill. 2d 414, 396 N.E.2d 499, the supreme court found that explicit findings by the court are not only of aid to an appellate court but are "indispensable requirements" of section 610(b). (*Harne*, 77 Ill. 2d 414, 420, 396 N.E.2d 499, 501.) The court also noted that little discretion remains in the trial court when acting on a petition for modification of custody. 77 Ill. 2d 414, 421, 396 N.E.2d 499, 502.

■■ Section 602, unlike section 610(b), does not require the trial court to make findings; rather, the court is directed to "consider all relevant factors" including certain specified ones. Under section 610(b) the fulfillment of a single condition could suffice to justify a change in custody, whereas it is unlikely that any single factor would be controlling under section 602. Furthermore, the drafters of the Marriage and Dissolution of Marriage Act clearly intended trial courts to have a broader range of discretion in making an initial custody determination than in considering a petition for modification of custody. For these reasons, and in accordance with the *Melear* decision, we conclude specific findings of fact are not required under section 602 of the Marriage and Dissolution of Marriage Act.

Section 602 does, however, require that the record contain sufficient evidence concerning the specified factors, which we have previously quoted in full. At the hearing below, the court heard extensive testimony from the parties, their friends and neighbors, and expert medical witnesses. That testimony included opinions and information concerning each of the factors listed above. The evidence relating to the section 602 factors was more than sufficient for the trial court to make a reasoned decision as to the custody of Tara and Abigail.

Jeff Atkinson next argues the trial court abused its discretion and made an error of law by awarding custody to Janet Atkinson. In making this argument he contends the record demonstrates it is in the best interest of the children that they be in his custody and that the trial court improperly decided the case on the basis of sex, as was demonstrated in the trial judge's comment that his decision might not be the same if he were dealing with two male children.

A decision of the trial court regarding custody will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence or unless it appears that manifest injustice has been done. (*De Franco v. De Franco* (1978), 67 Ill. App. 3d 760, 384 N.E.2d 997.) The presumption favoring the result reached by the trial court is strong and compelling in custody cases because it, rather than the reviewing court, is in a better position to evaluate the credibility of the witnesses and the needs of the children. *Gren v. Gren* (1978), 59 Ill. App. 3d 624, 375 N.E.2d 999.

■ The witnesses at the hearing were generally unanimous in their opinions concerning the quality parenting provided by both Jeff and Janet Atkinson. It is apparent from the record that both parties are devoted to their daughters and deeply concerned about their welfare. Not a single witness expressed an opinion that either Jeff or Janet Atkinson was an unfit parent. Under these circumstances we affirm the trial court's decision as to custody.

■ We cannot agree with Jeff Atkinson's contention that the custody decision was decided on the basis of sex or that the decision denied him due process and equal protection by discriminating on the basis of sex. Although the "tender years doctrine," the presumption that young children should be with their mother, is now thought to be of questionable validity (*Jines v. Jines* (1978), 63 Ill. App. 3d 564, 380 N.E.2d 440), this does not mean that the sex of the children should not be one factor to be considered when making a custody determination. We cannot say that the record demonstrates an improper presumption in favor of an award of custody to the mother of Tara and Abigail. We thus reject this argument.

A separate hearing was conducted concerning the division of marital property, child support and maintenance.

The parties were married in 1968 following their first year of undergraduate college. During most of the marriage the parties were attending school, as undergraduates and then as law students. Janet Atkinson also attended two semesters of study at a business school.

Financial support for the marriage came primarily from monies belonging to Jeff Atkinson which he inherited from his father and grandfather prior to his marriage. Jeff Atkinson paid for all of Janet Atkinson's educational expenses during the marriage with the exception of one-half year of undergraduate education for which Janet Atkinson had a scholarship. Janet Atkinson's total expenses for undergraduate, law and business school amounted to approximately $24,000.

Jeff Atkinson also paid for full-time housekeepers since the parties began law school in 1974. Prior to that time he paid for part-time maids and child care services. These expenses amounted to just over $40,000. Jeff Atkinson testified that he performed more of the homemaker services

than Janet Atkinson. He said he spent more time than Janet Atkinson in raising the children and taking care of their daily needs. Jeff Atkinson also testified that he handled the majority of household errands. Janet Atkinson denied these assertions.

The parties' primary marital asset was their home, which was held in joint tenancy. It was purchased in 1974 for $89,000. The current market value of the home was estimated at $140,000. Jeff Atkinson made a $30,000 down payment on the home out of his nonmarital inherited assets. He used another $10,000 of his funds to purchase appliances and carpeting for the home. From 1974, when the home was purchased, until 1979, Jeff Atkinson made the mortgage payments from funds derived primarily from his nonmarital assets. The current mortgage balance is about $55,000.

At the beginning of the marriage, Jeff Atkinson's net worth was $1,079,000. Jeff Atkinson testified that at the end of the marriage the value of his assets was $724,000 including the full value of the house. His assets were decreased because of school and household expenses, the purchase of the marital home, and also because of declines in the stock market.

During the first four months following the judgment of dissolution the parties' joint checking account remained open. Jeff Atkinson made the only deposit of funds to the account during this time. Janet Atkinson made numerous withdrawals from the account during this period despite protests from Jeff Atkinson and his counsel. The withdrawals made by Janet Atkinson totalled $5,567 and were for her personal expenses rather than for the children or home. The account was closed in February of 1979.

At the time of the hearing, Janet Atkinson was working part-time as an attorney for a salary of $15,000. Jeff Atkinson's income from his law firm and from his nonmarital assets was $54,000. The children are the beneficiaries of two life insurance policies on the life of Jeff Atkinson with a total value of $70,000.

The court awarded Janet Atkinson rehabilitative maintenance of $350 per month for four months. Janet Atkinson was also awarded all the marital property with the exception of Jeff Atkinson's individual retirement account. Janet Atkinson was awarded the entire interest in the marital home. Jeff Atkinson was ordered to pay $261 per week in child support.

Jeff Atkinson was also ordered to establish a $100,000 trust fund to secure the children's education and support. The interest and dividends from the securities held in the trust were to be retained in the trust until final distribution to Jeff Atkinson when the youngest child reaches age 23.

Jeff Atkinson appeals from the award of the entire interest in the

marital home to Janet Atkinson and from the requirement that he set up a trust fund.

The portion of the order requiring Jeff Atkinson to set up a trust was based upon section 503(d) of the Marriage and Dissolution of Marriage Act. That section, in its entirety, provides:

> "The court may protect and promote the best interests of the children by setting aside a portion of the jointly or separately held estates of the parties in a separate fund or trust for the support, maintenance, education, and general welfare of any minor, dependent, or incompetent child of the parties." (Ill. Rev. Stat. 1977, ch. 40, par. 503(d).)

Both parties have noted that this section of the Marriage and Dissolution of Marriage Act was patterned after section 307(b) of the Uniform Marriage and Divorce Act which is identical to section 503(d) in all important respects. The Commissioners' Comments to that section state in part:

> "Subsection (b) affords a way to safeguard the interests of the children against the possibility of the waste or dissipation of the assets allotted to a particular parent in consideration of being awarded the custody or support of a child or children." (9A Uniform Laws Annotated 144 (1979).)

Jeff Atkinson contends his assets were reduced during the course of the marriage not through any "waste" on his part but rather because of the unusual educational expenses which he incurred on behalf of himself and Janet Atkinson and also because of declines in the stock market. Janet Atkinson contends that the depletion of Jeff Atkinson's assets during the marriage indicates a "possibility" of waste or dissipation and that this is all that is necessary to justify the imposition of a trust for the benefit of the children.

■■ Section 503(d) of the Marriage and Dissolution of Marriage Act does not explicitly require a showing of waste or dissipation of assets as a condition precedent to an order requiring the imposition of such a trust. Nevertheless, we believe imposition of a section 503(d) trust is inappropriate in the absence of evidence showing some need to protect the interests of the children. See *In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 397 N.E.2d 488.

Although Jeff Atkinson's assets have been reduced, there is no evidence that this was caused by irresponsible actions. Nor was there any evidence to show that Jeff Atkinson would be likely to ignore his daughters' financial needs in the future. The evidence presented below demonstrated that Jeff Atkinson has been a fit, devoted and responsible parent. Under these circumstances we conclude the trial court exceeded the scope of its discretion in ordering the establishment of a trust fund for

the benefit of the children. That portion of the judgment below is reversed.

Jeff Atkinson next argues the trial court erred in awarding the entire interest in the marital home to Janet Atkinson.

Section 503(c) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 503(c)) provides in part "the court shall assign each spouse's non-marital property to that spouse." Nonmarital property is defined in section 503(a) as:

> "(1) property acquired by gift, bequest, devise or descent;
> (2) property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise or descent; * * *." (Ill. Rev. Stat. 1977, ch. 40, par. 503(a).)

Janet Atkinson appears to concede that the $40,000 provided by Jeff Atkinson for the down payment on their home and the purchase of furnishings was his nonmarital asset as it was acquired by him, prior to the marriage, through inheritance.

The question then is whether the $40,000 retained its character as a nonmarital asset when title to the house in which it was invested was put into both parties' names as joint tenants. Jeff Atkinson argues the $40,000, when used for the purchase of the house, became "property acquired * * * in exchange for property acquired by gift, bequest, devise or descent" and thus remained nonmarital property. While this assertion would be true if title to the home had been taken in Jeff Atkinson's name alone, we believe he is overlooking the significance of title being in joint tenancy.

■■ The general common law rule is that property taken in joint tenancy with one's spouse raises a presumption that a gift is being made of a one-half interest, even where all the purchase money is supplied by one spouse. *Peck v. Peck* (1959), 16 Ill. 2d 268, 157 N.E.2d 249; *Bellow v. Bellow* (1976), 40 Ill. App. 3d 442, 352 N.E.2d 427.

■■ The Marriage and Dissolution of Marriage Act does not expressly or, in our opinion, inferentially, reject this common law rule. We believe the common law presumption of gift continues to apply to this situation. When the marital home was purchased with Jeff Atkinson's nonmarital funds and title was taken with Janet Atkinson in joint tenancy, the $40,000 was transmuted into marital property. No evidence was presented by Jeff Atkinson which would rebut the presumption of a gift.

The courts in *In re Marriage of Key* (1979), 71 Ill. App. 3d 722, 389 N.E.2d 963, and in *In re Marriage of Dietz* (1979), 76 Ill. App. 3d 1029, 395 N.E.2d 762, reached contrary conclusions in cases involving substantially similar issues. But see *Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513, 386 N.E.2d 517, where the court concluded the commingling of marital and nonmarital funds in a joint bank account evinced an intent to have the

nonmarital monies treated as part of the marital estate. See also *Conrad v. Bowers* (Mo. App. 1975), 533 S.W.2d 614, and *In re Marriage of Killgore* (Colo. App. 1974), 532 P.2d 386, where courts in other jurisdictions, interpreting similar statutes, have reached conclusions in accordance with ours.

Jeff Atkinson's next argument, that an award of virtually all the marital property to Janet Atkinson was not a just division, must be considered in light of our conclusion that the $40,000 for the house and furnishings was transmuted into marital property. The house was the parties' only significant marital asset.

■■ Section 503(c) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 503(c)) requires the trial court to divide the marital property "in just proportions," considering all relevant factors. The statute lists 10 different factors which are to be considered. Those which seem particularly relevant to this case are: the contribution or dissipation of each party to the marital and nonmarital property, the value of the property set apart to each spouse, relevant economic circumstances of each spouse, amount and sources of income of each party, custodial provisions for any children, and the opportunity of each party for future acquisition of capital assets and income.

■■ There is no requirement that marital property be divided in *equal* proportions. (*In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 393 N.E.2d 1065; *Schubert v. Schubert* (1978), 66 Ill. App. 3d 29, 383 N.E.2d 266.) Jeff Atkinson's substantial contribution to the acquisition of the marital home is recognized under section 503(c). Other factors, however, weigh in favor of Janet Atkinson. The statute requires the court to consider the "value of the property set aside to each spouse." (Ill. Rev. Stat. 1977, ch. 40, par. 503(c)(2).) Therefore, Jeff Atkinson's nonmarital assets are relevant to the division of the marital property. The marital home, which was awarded to Janet Atkinson, was valued at approximately $140,000 with an outstanding mortgage of $55,000. Jeff Atkinson's annual income from his nonmarital assets is approximately $27,800 and his salary from his law firm is $26,000. Janet Atkinson's salary for her part-time work at a law firm is $15,000. By virtue of Jeff Atkinson's full-time employment and substantial assets, his opportunity for future acquisition of capital assets and income appears greater than that of Janet Atkinson. Under these circumstances, we conclude the trial court acted within the scope of its discretion in awarding virtually all of the marital property to Janet Atkinson.

Jeff Atkinson's final argument is that funds withdrawn by Janet Atkinson from a joint checking account subsequent to the judgment of dissolution were his nonmarital funds and should have been returned to him. ■■ This argument overlooks the fact that the bank account was held

in joint tenancy. The judgment of dissolution did not affect the parties' joint tenant interests in the account. Each joint tenant possesses a present estate in the assets comprising the joint tenancy. (*In re Estate of Taggart* (1973), 15 Ill. App. 3d 1079, 305 N.E.2d 301.) Therefore, Janet Atkinson had the right to withdraw funds from that account even assuming that the only deposits were made by Jeff Atkinson during the period in question.

For the foregoing reasons the judgment of the circuit court is affirmed in part and reversed in part.

Affirmed in part, reversed in part.

JOHNSON and ROMITI, JJ., concur.