*In re* SUPPORT OF ALICE GRACE McGREW, Petitioner-Appellee.—
(WILLIAM FRANKLIN McGREW, Respondent-Appellant.)

Fifth District    No. 79-615

Opinion filed October 16, 1980.

John R. Meyer, of Meyer & Meyer, of Flora, for appellant.

Ralph D. Glenn, of Glenn & Logue, of Mattoon, for appellee.

Mme JUSTICE SPOMER delivered the opinion of the court:

Respondent William McGrew appeals from an order granting $200 per month permanent maintenance to petitoner, Alice Grace McGrew, following the dissolution of their marriage under the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, pars. 101 through 801). Respondent contends that the trial court abused its discretion in awarding maintenance because (1) his former wife did not meet the threshold requirements for an award of maintenance under section 504(a) of the Act since she had sufficient property to provide for her reasonable needs, was able to support herself through reasonable employment, and otherwise had sufficient income; and (2) an antenuptial agreement between the parties precluded a maintenance award. Respondent contends in the alternative that even if petitioner did meet the 504(a) statutory criteria for a maintenance award, in setting the amount thereof

the trial court failed to give proper consideration to all the relevant factors under section 504(b).

At the time of the marriage of the parties on November 11, 1973, Alice Grace McGrew was 50 years old. She had been married previously, had children from that marriage who were grown, and had supported herself from the time of the death of her husband in December 1969. William McGrew was 61 at the time of the marriage and also had grown children from a previous marriage.

The parties executed an antenuptial agreement on November 5, 1973, six days prior to the marriage. The agreement revealed that Mrs. McGrew owned 280 acres of farm land in Wayne County used as a combination grain, hay, and livestock farm. On the farm was a seven-room ranch-type house with basement, built in 1953, barns and other outbuildings. The house was furnished with Mrs. McGrew's household furnishings and appliances. In addition, she owned a 1968 Dodge automobile, $3,700 worth of unsold crops, $600 cash in a checking account, and about 100 head of cattle. For almost 13 years prior to the marriage, Mrs. McGrew had been steadily employed at the Clay County Hospital in Flora, Illinois, doing nursing work, although she was neither a registered nor licensed practical nurse. For the four years preceding this marriage, she earned $18,423.10 from the nursing job. At the time of marriage she owed $2,500 to the First National Bank of Flora, Illinois.

The agreement disclosed that Mr. McGrew owned 447 acres of farm land in Wayne and Clay counties, improved with a six-room house built in 1967 and some outbuildings; farm machinery; a 1967 Plymouth automobile; $16,446 in accounts receivable; and approximately $30,000 worth of unsold crops. He owed $3,400 to the First National Bank of Xenia, Illinois. At the time, in addition to farming, he did custom combining.

Following the marriage, the parties lived in Grace's house and rented William's house for $100 per month, which sum was given to Grace. They managed both farms, as well as additional land rented by William. In September 1975, they moved to William's house. The parties lived together a little over three years, Grace moving out in December 1976. At the time of trial in May and June, 1979, Grace was 56 years old, and William was 66 years old. William had retired from farming and had leased his land under a share-crop agreement whereby the landlord got 40 percent and the tenants 60 percent.

The McGrews never commingled the profits from their farms while married. In March 1974, Grace purchased 16 acres of land for $3,200, which came from the sale of crops owned prior to the marriage. She also received 40 cares of land as a gift from her father. After the separation, she leased this land to her father for his lifetime. At the time of the trial, he

was 84 years old and in poor health. There was no evidence in the record of any rental received from this tract.

During the marriage William paid off a $26,700 promissory note—cosigned by Grace—owed to a third party by Grace's son, Larry Mix. The parties agreed that William paid the debt of his own volition and without the prior knowledge of Grace or her son, but William testified that Grace agreed to repay the money to him if her son did not. This matter was the subject of a separate lawsuit in another county between William, Grace, Larry Mix and his wife, which was pending at the time of the dissolution hearing.

When Mrs. McGrew left the marital home on December 29, 1976, she moved to an apartment in Effingham. She testified that her monthly expenses were: rent, $235; utilities, $60; food, $120; clothing, $50; laundry, $15; medical and dental, $25; house and doctors' insurance, $25; home-owner's insurance, $35; car insurance, $10; church, $20; automobile operation, $100; loan expenses, $78; recreation and entertainment, $10; and payments on notes and miscellaneous, $100; a total of $883 per month. She owed $11,600 to the First National Bank of Flora, which she had borrowed to pay the following expenses: barn material, $6,000 (for improvements on her farm); taxes, $1,600; living expenses since separa-tion, $1000; purchase of cattle, $3,000. She also stated that she owed her son $6,000 for living expenses. Following the separation, she rented her farm to her son, Larry Mix, and he agreed to pay her an annual rent of $7,300. This figure was based on a $25-per-acre rental and did not include any rent for the house and furnishings. This lease was terminable at any time by her giving proper notice to the tenant. She sold her cattle to him for a total of $23,900, which he agreed to repay by making repairs and improvements to the buildings on her farm within a reasonable time. Although she testified that the sale was made in August 1976, the written agreement was prepared in March of the following year and back-dated, which was after the separation. Both petitioner and her son testified that as of the trial date, June 1979, her son had paid her no part of the $23,900 and had made no improvements to her property, nor had she requested payment.

At the time of the hearing, William's assets also included the sum of $53,275, representing cash in the bank and accounts receivable. In 1973 his net income was $11,124.11. In 1974 and 1975, their joint net income was $13,141.04 and $19,438.86, respectively. In 1976, 1977, and 1978, his net income was $25,081.93, $35,892.97, and $14,408.59, respectively, while hers was $10,558, $11,685, and $9,455, respectively, from rent on her farm, private duty nursing, and wages paid for farm work done for her son. Her wages for January 1979 were $280, and for February, $225. She

broke her arm in February and did not resume her nursing occupation, although at the time of trial she testified that she was in good health. She testified that she had worked for her son as late as the week before trial.

A real estate broker testified that petitioner's real estate had a fair cash market value of $322,200, and a fair cash market rental value of $12,630 per year for the farm land and between $1,500 and $1,800 for the house. A farmer of over 40 years' experience who farmed 700 acres— some of which adjoined petitioner's land—placed the fair cash market rental value of the land at $11,495 per year, while respondent set it at $14,200. Petitioner estimated her household goods and furnishings to be worth $2,000. She also testified that she had been eligible to receive a pension of $65.10 per month from the Illinois Municipal Retirement Fund since age 55 in October 1978, but had never applied for it. If she waited until age 60, the monthly benefit would be $93.

Petitioner testified that her standard of living was the same at the time of trial as it was when she was living with the respondent.

Following the hearing, the trial judge found that because of the parties' antenuptial agreement, there was no marital property to be divided, and thus each party retained his or her own property. No appeal was taken from that finding. The judge also found that the antenuptial agreement did not preclude an award of maintenance, and maintenance was awarded in the sum of $200 per month, commencing January 1, 1977, the first month following the separation. Respondent filed a motion for modification, and in denying the motion the court stated that he "took into account all the evidence presented and considered all requirements for maintenance and entered this order based on all factors but especially to permit the plaintiff to maintain standard of living established during the marriage."

Section 504 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 504) as pertinent to this appeal provides as follows:

> "(a) In a proceeding for dissolution of marriage or legal separa-tion or declaration of invalidity of marriage, or a proceeding for maintenance following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse, the court may grant a maintenance order for either spouse, only if it finds that the spouse seeking maintenance:
>
> > (1) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and
> >
> > (2) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or

(3) is otherwise without sufficient income.

(b) The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to marital misconduct, after consideration of all relevant factors, including:

(1) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) the standard of living established during the marriage;

(4) the duration of the marriage;

(5) the age and the physical and emotional condition of both parties; and

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

(c) The court may grant and enforce the payment of such money for equitable maintenance during the pendency of an appeal which is against the party receiving such equitable maintenance, as the court shall deem reasonable and proper."

Respondent contends that the award of maintenance was contrary to the manifest weight of the evidence and therefore an abuse of discretion because petitioner failed to prove any of the prerequisites to maintenance required by section 504(a). We agree.

As this court stated in *In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 101, 393 N.E.2d 1065, 1078:

"With respect to Husband's argument that the trial court abused its discretion in denying him maintenance, section 504 of the Act permits an award of maintenance *only* when the court can find that a spouse is unable to support himself through appropriate employment or is otherwise without sufficient income."

■■ Although it was not necessary for the trial court to designate specifically that portion of section 504(a) upon which it founded the award of maintenance, the basis for the award must be established in the record. (*In re Marriage of Coram* (1980), 86 Ill. App. 3d 845, 408 N.E.2d 418; *In re Marriage of Reyna* (1979), 78 Ill. App. 2d 1010, 398 N.E.2d 641.) Subsections (1), (2), and (3) are prerequisites or preconditions to an award of maintenance (*Reyna*, 78 Ill. App. 3d 1016, 1017; *In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 398 N.E.2d 126; see Historical and

Practice notes, Ill. Ann. Stat., ch. 40, par. 504(a), at 523 *et seq.* (Smith-Hurd 1979)).

■■ A *fair reading of this record discloses that petitioner did not require* maintenance from respondent to support herself in a manner commensurate with that established during the marriage. The undisputed evidence showed her net worth to be approximately $329,829. She testified that she was in good health and able to work and in fact had worked the week before the trial. She had been employed for approximately 13 years prior to this marriage and had also worked since the separation. In one year since separating from the respondent, in addition to farm rental she had earned $4,385 in wages. In addition, she was eligible for an IMRF pension, but had not applied for it. Although petitioner rented the farm to her son for $7,300 per year, the record shows that at its present use the actual fair cash market rental value was from $12,995 to $16,000 per year. These figures did not include any sum for rental of the house, which would be at least $100 monthly, the amount defendant paid petitioner when they lived in the house. Her son testified that he had done nothing toward making any improvements to the property in the three-year period since he "bought" plaintiff's cattle; no part of the purchase price of $23,900 had been paid. He also owed rent to his mother in the amount of $7,300 at the time of the trial, and petitioner testified that she had never made a demand on him for payment of any sum of money due her.

■■ Clearly, it was petitioner's privilege to make arrangements favorable to her son, but having done so, she could not use this self-imposed poverty as a basis for her claim for maintenance from respondent. In determining whether she has sufficient income with which to support herself, consideration must be given to the income level which she is able to attain and not merely that which she has set for herself through arrangements which clearly are unfavorable to her. (Compare *In re Marriage of Smith* (1979), 77 Ill. App. 3d 858, 396 N.E.2d 859, where court considered not only husband's actual income at time of trial, but also his reasonable potential earning capacity in fixing an award of maintenance to wife; *In re Marriage of McCarthy* (Colo. App. 1975), 533 P.2d 928, where husband, a lawyer, ceased practicing law and at time of trial had no income; although court recognized that he had a right to choose his own lifestyle, he was not released from the obligation to pay maintenance to his wife based on his potential earning capacity; *In re Marriage of Vanet* (Mo. App. 1976), 544 S.W.2d 236, where husband, as a member of board of directors, voted himself a reduction in salary, and refused better-paying employment, and court allowed wife maintenance based on his potential earning capacity.) We note, too, that petitioner's attorney in closing argument, commenting about the $7,300 rental figure, said "I think it's fair to say that's lower than she would get from a stranger * * * ."

In *Borowitz v. Borowitz* (1974), 19 Ill. App. 3d 176, 182, 311 N.E.2d 292, a case decided prior to the present act, the court in fixing alimony held that "[w]here both the husband and wife are in receipt of income or possess valuable property, the wealth of the wife as well as the husband should be taken into consideration." In *Brueggemann v. Brueggemann* (Mo. App. 1977), 551 S.W.2d 853, the Missouri statute relating to maintenance—which is much like section 504 of the Illinois statute—was interpreted, and the court upheld a denial of maintenance to wife where she had sufficient property to provide for her reasonable needs and was able to support herself by appropriate employment. The inability to support oneself is relative and is measured by the living standard established during the marriage (*In re Marriage of Kitson* (1974), 17 Or. App. 648, 523 P.2d 575), and we find that petitioner does not require maintenance from respondent in order to maintain such living standard.

Because of our holding that petitioner did not establish a need for maintenance, it is unnecessary to reach the issue of whether the antenuptial agreement precluded the payment of maintenance. The agreement did provide, however, that respondent was to provide support and a home for his wife during the continuance of the marriage, and this was admitted by the respondent. The evidence revealed that respondent did not furnish any support to his wife after December 29, 1976, the date of the separation. Therefore, we find that petitioner is entitled to the sum of $200 per month from that date up to the date of the dissolution of the marriage, April 23, 1979, a total of $5600. Accordingly, the order of the trial court awarding support during this period is affirmed. The award of maintenance after the date of the dissolution of the marriage is reversed. In all other respects the judgment of the trial court is affirmed.

Affirmed in part and reversed in part.

JONES, P. J., and KARNS, J., concur.