*In re* MARRIAGE OF GAIL SIEGEL, Petitioner-Appellee, and MICHAEL J. SIEGEL, Respondent-Appellant.

First District (2nd Division)   Nos. 82—2456, 83—849 cons.

Opinion filed April 17, 1984.

Richard W. Christoff, of Chicago (Sanford Kahn, Ltd., of counsel), for appellant.

Charles Locker, of Chicago, for appellee.

JUSTICE PERLIN delivered the opinion of the court:

Respondent Michael J. Siegel (Michael) appeals the custody award, property division, maintenance and attorney fees portions of a judgment entered in the circuit court of Cook County on October 6, 1981, dissolving his marriage to petitioner, Gail Siegel (Gail). On appeal, Michael contends that the trial court erred in awarding custody of the parties' two minor children to Gail; in finding that Michael had dissipated the marital home; in directing Michael to pay to Gail $30,000 as her half of the equity in the marital home; in finding that Michael should pay Gail maintenance of $150 per month for a period of three years; and in directing Michael to contribute $9,000 to Gail's attorney fees. For the reasons hereinafter stated, we affirm the judgment of the trial court.

Michael and Gail were married on July 26, 1964. Two children were born of this marriage: Scott, born March 19, 1966, and Jason, born January 24, 1970. On August 15, 1979, Gail filed a petition for dissolution, alleging mental cruelty. On November 21, 1980, Michael filed a counterpetition for legal separation or dissolution, alleging adultery and mental cruelty. On October 6, 1981, after a bifurcated hearing, an order of dissolution was granted on Michael's counterpetition on the stipulated grounds of mental cruelty.

Between August 1979 and January 1983, both parties filed numer-

ous "pleadings." Gail filed 25 pleadings regarding temporary maintenance and discovery, and Michael filed 20 pleadings regarding visitation rights, discovery and a third-party complaint alleging alienation of affection against Mr. Goldstein, Gail's alleged "boyfriend." On October 3, 1980, Michael's third-party petition against Mr. Goldstein was severed and was transferred to the law division.

Subsequent to the order of dissolution, three separate hearings were held to determine the issues of: (1) custody; (2) property division and maintenance; and (3) attorney fees.

### (1) Custody

On October 14, 1981, at the contested hearing on custody, Michael testified he resides in Deerfield, Illinois, and is an attorney working as a "sole practitioner." Michael claimed Gail was not a fit and proper parent because her "social life" prevented her from being available to the children to prepare meals or to be at home when they were ill; Gail punished the children by not permitting them to visit with their father; and Gail "placed her own needs above those of the children."

Gail testified she resided with her two sons in the marital home in Deerfield, Illinois, and is employed part time as a personnel representative. Gail denied that she is often absent from the home; she never punished the children in a manner that prevented their visiting with their father; and she offers the children attention, love, discipline, guidance and proper values. Gail conceded she was "dating" Mr. Goldstein and on several occasions was away from the marital home "overnight." On these occasions she left the children at home with her mother, the children stayed with Michael at his apartment, or the children stayed at home alone.

Dr. Daniel Beach, a registered clinical psychologist, testified for Michael: he made psychological evaluations of Michael and the two children; the results of his evaluations reveal Michael is "a quite normal individual"; Scott is "a very normal and average adolescent; and Jason "showed a child who is functioning quite normally" and "had an unusual level of emotional maturity for a child his age." Scott told Dr. Beach he preferred to live with Michael because "he felt more cared for when he was with his father."

Susan Genson, a cousin to Gail, testified that, in her opinion, it would be in the best interests of the children if their custody was awarded to Gail.

Libby Savner, vice-president of the board of education of Deerfield and a friend of the Siegels, testified that Michael is an "outstanding parent."

The court conducted an *in camera* hearing in which the children expressed a preference to live with their father because they "felt they could do more with their father." Scott voiced apprehension about getting along with the children of their mother's "boyfriend" if they married. The children stated they loved both parents and were well cared for by both parents.

The custody hearing consumed six days. On January 14, 1982, the trial court, after "having considered all the evidence and relevant factors as set forth in Section 602 of the Illinois Marriage and Dissolution of Marriage Act" (hereinafter referred to as the Act), (Ill. Rev. Stat. 1979, ch. 40, par. 602), awarded custody to Gail.

(2) PROPERTY DIVISION AND MAINTENANCE

On March 9, 1982, at the hearing on property division and maintenance, Michael testified: in 1980 he had a gross income of $78,840 and expenses of $58,000 resulting in a $20,840 net income; he rents an apartment in Deerfield for $575 per month; in January 1981 he purchased a new car for $12,000; he has a car loan costing $220 per month and a bank loan costing $250 per month. His total expenses in 1981 for rent, loans, food, the children's summer camp and maintenance,[1] amounted to $22,710.

On April 22, 1982, Gail testified: in 1981 she worked as a receptionist for a doctor and her gross earnings were $6,500; she currently works as a "special services representative" and is paid "commissions"; she has only a high school education and requires refresher courses in typing and business to find appropriate employment. In addition to the $750 monthly maintenance paid by Michael, under the temporary order of March 21, 1980, Gail received "some money" from her father and her brother. In her affidavit Gail listed the expenses for herself and the children as $1,923 per month.

Gail further testified that since January 1980 she has made no mortgage payment. In 1980, in a telephone conversation with Michael, she offered to pay one-half of the arrearage on the mortgage by bor-

---

[1] On March 21, 1980, an order was entered upon Gail's emergency petition for *temporary* maintenance, which order provided,

"3) *** Michael Siegel shall pay to Gail as *unallocated maintenance and support* the sum of forty percent of his net income being determined to be his adjusted gross from the law practice minus state and federal taxes (based as a single man) *minus* F.I.C.A.-with a minimum payment of $750.00 per month and neither party being ordered to pay the marital home mortgage to Niles Savings, or Michael Siegel pay the sum of $600.00 per month as unallocated maintenance and support and pay the mortgage payment."

rowing money from her cousin, but Michael told her the mortgage was her "problem." In 1982, following foreclosure proceedings by the Niles Savings Bank, the balance due for redemption of the property was approximately $70,000. She estimated the value of the marital home approximated $110,000. Michael offered no evidence as to the value of the marital home. In February 1982, when the redemption period for the marital home had expired, Gail and the children moved to their present home in Deerfield where the rental was $750 per month.

On September 9, 1982, after the hearing on the issues of property division and maintenance, the court found:

"9. *** said Michael Siegel has allowed the dissipation of the major asset of the parties, being the marital home, by allowing it to go to foreclosure and subsequently to be sold pursuant to court order, even though he had the opportunity and ability to prevent this. That there was an equity of approximately $60,000.00 in said marital home and that the petitioner, counter-respondent, Gail Siegel, is entitled to an amount equal to one-half of said equity."

Based upon this finding, the trial court ordered, *inter alia*:

"G. That the respondent, counter-petitioner, Michael Siegel, is to pay unto the petitioner, counter-respondent, Gail Siegel, the sum of Thirty Thousand ($30,000.00) Dollars by the end of a five (5) year period from the date of entry of this Judgment, and said Michael Siegel shall pay to Gail Siegel Nine (9%) Percent interest per year on the unpaid balance, payable quarterly."

The trial court also ordered Michael to pay to Gail $700 per month for the support and maintenance of the minor children and $150 per month for Gail's maintenance.[2]

(3) ATTORNEY FEES

On January 10, 1983, at the hearing to determine the payment of attorney fees, Gail's attorney testified: over 200 hours were devoted to this case and their ordinary fees were $100 per hour for office time, $125 per hour for court time other than trial, and $150 per hour for trial time. Time sheets reflecting the attorneys' time spent on this case were admitted into evidence.

---

[2]The court found (paragraph 10 of its findings) that Michael "was not persuasive in his argument as to his earnings, and that *his income is greater than he represented and alleged it to be.*" (Emphasis added.)

On March 7, 1983, the trial court found that based on the attorneys' time and hourly rates, their fees would exceed $30,000. In light of the parties' financial situation, however, the trial court stated it was "precluded" from awarding such a sum and ordered Michael to pay Gail's attorneys $9,000 within 90 days of the order. Upon oral argument, Gail's attorneys calculated this payment for their services to equal approximately $42 per hour.

I

Michael contends initially that the trial court's award to Gail of custody of the parties' two minor children is contrary to the manifest weight of the evidence. Specifically, Michael argues that the evidence overwhelmingly supports an award of custody to him; that the trial court erred in not admitting into evidence certain statements made by the children to the witness, Libby Savner; to the psychologist, Dr. Beach; and to Michael in his conversations with the children; that the trial court erred in not permitting Dr. Beach to state his professional opinion as to which of the parties should be awarded custody; that the trial court erred in denying as hearsay the content of a conversation Dr. Beach had with the principal of the school attended by Scott; and that the trial court erred in failing to consider the preferences of the children in awarding custody.

Courts of review in Illinois have held that the determination of child custody rests largely within the broad discretion of the trial court, and its decision will not be disturbed on appeal unless the award is contrary to the manifest weight of the evidence (*In re Marriage of Leopando* (1982), 106 Ill. App. 3d 444, 435 N.E.2d 1312), or unless the court has abused its discretion (*In re Custody of Switalla* (1980), 87 Ill. App. 3d 168, 408 N.E.2d 1139). "The presumption favoring the result reached by the trial court is strong and compelling in custody cases because it, rather than the reviewing court, is in a better position to evaluate the credibility of the witnesses and the needs of the children." *In re Marriage of Atkinson* (1980), 82 Ill. App. 3d 617, 625, 402 N.E.2d 831, 836.

In the instant case the vantage point of the trial court allowed it to observe the children at close range in an *in camera* hearing; to evaluate the temperaments, personalities and capabilities of both parents through the six days of custody trial; and to assess and to weigh the testimony of witnesses familiar with the family as well as the testimony of the psychologist who had interviewed both children and Michael. This evidence enabled the trial court, as is required, to consider all of the factors specified in section 602 of the Act (Ill. Rev. Stat.

1979, ch. 40, par. 602) in determining custody in accordance with the best interest of the children. It is not necessary that the judge recite the specific factors upon which he relied in making his decision. *In re Marriage of Ramer* (1980), 84 Ill. App. 3d 213, 405 N.E.2d 401.

Michael next asserts that the trial court erred during the custody hearing by not admitting into evidence certain statements made by the children in a telephone conversation with Libby Savner; statements made by the children to the psychologist, Dr. Beach; and statements made to Michael by the children. Michael contends these statements should have been admitted under the "state of mind" exception to the hearsay rule and that the trial court's failure to hear such evidence prevented the court from ascertaining the children's "state of mind" when they expressed their preference as to custody. Michael argues that despite the trial court's statement that it had in fact considered all of the factors specified in section 602 of the Act, it was not possible for the court, in the absence of such evidence, to have properly and fully considered the appropriate factors. Michael relies on *In re Marriage of Sieck* (1979), 78 Ill. App. 3d 204, 218, 396 N.E.2d 1214, 1224, in which the trial court permitted the husband's friend to testify what the children allegedly told her about their relationship to their mother. On appeal, the appellate court stated, with respect to such statements, that "the record shows that they were not offered to prove the truth of those statements, but rather as evidence of the children's state of mind and emotional state. No error is found in the court's receiving such testimony." Michael relies also on *In re Marriage of Rizzo* (1981), 95 Ill. App. 3d 636, 642, 420 N.E.2d 555, 560, in which, during a custody hearing, the husband attempted to elicit testimony from a neighbor to the effect that the children told the neighbor they preferred to live with the husband. The wife objected to such testimony as hearsay and the trial court sustained these objections. Upon appeal, the husband contended the statements should have been admitted under the "state of mind" exception to the hearsay rule. The appellate court held:

> "one of the ultimate questions the court must determine is the wishes, or *state of mind,* of the children concerning custody. This being the case, the statements by the children to Montonano [neighbor] shortly before trial expressing their then existing state of mind, though hearsay, were *admissible if made under conditions assuring trustworthiness.*" (Emphasis added.) 95 Ill. App. 3d 636, 642.

■ We have no quarrel with the reasoning in *Sieck* and *Rizzo* concerning the importance of eliciting evidence reflecting the chil-

dren's state of mind in a custody case. But, as in *Rizzo*, we do not believe Michael was prejudiced by the court's ruling. In the instant case, the trial court conducted an *in camera* hearing wherein the children had an opportunity to express their wishes to the judge and to the attorneys for both parents who were present and were permitted to question the children. The court also heard from the psychologist, Dr. Beach, who testified regarding the children's expressed wishes. Thus, the court was presented with ample evidence concerning the preferences of the children.

Michael next contends that the trial court erred in not permitting the psychologist, Dr. Beach, to state his professional opinion with respect to which of the parties should best be awarded custody of the two boys. He was permitted, however, to testify to the results of his testing and that Scott expressed a preference to live with his father.

A consideration of the mental health of individuals involved in a child custody dispute is made necessary by section 602(a)(5) of the Act (Ill. Rev. Stat. 1979, ch. 40, par. 602(a)(5)). The testimony of a psychologist, however, although providing the court with relevant evidence to aid in its considerations, is not determinative. "[I]t may be properly considered with respect to whatever illumination it may provide to the court in identifying the best interests of the children." *In re Marriage of Sieck* (1979), 78 Ill. App. 3d 204, 216, 396 N.E.2d 1214, 1223.

In the instant case, where Dr. Beach testified to the results of his testing of Michael and the two children; the court's conduct of an *in camera* hearing with the children in the presence of counsel for both parties; the testimony of witnesses knowledgeable of the family relationships; and the court's own opportunities to evaluate the persons involved during the six-day hearing surely afforded the trial court sufficient information with regard to "the mental and physical health of all individuals involved." Ill. Rev. Stat. 1979, ch. 40, par. 602(a)(5).

Michael's final contention with regard to the issue of custody is that the trial court failed to properly consider the preferences of the children. Section 602(a)(2) of the Act (Ill. Rev. Stat. 1979, ch. 40, par. 602(a)(2)) provides that in determining custody, the trial court shall consider "the wishes of the child as to his custodian." Here, the *in camera* hearing provided the trial judge an opportunity to inquire and to elicit the preference of the children. Both Scott and Jason expressed a preference to live with their father. At the time of the *in camera* hearing, Scott, who was 15 years old, stated that he preferred to live with his father because he was concerned whether he would

get along with the children of his mother's "boyfriend" should they marry. Jason, who was 11 years old at the time of the hearing, expressed a preference to live with his father because "there is more things I can do with him" such as "play football." Both children "thought" they were loved by both parents and would be well taken care of by either parent.

The preferences of a child, especially one who is mature, are to be given serious weight in custody decisions, especially where the child's desire is based upon reasons related to his best interests such as a desire to remain with friends; to continue attending the same school; and to remain in the same environment. (*Jines v. Jines* (1978), 63 Ill. App. 3d 564, 380 N.E.2d 440; *In re Marriage of McCune* (1980), 86 Ill. App. 3d 311, 408 N.E.2d 319.) In *Jines* the child was 14 years old, and in *McCune* the child was 15 years old.

In the instant case, we agree that Scott's preference is entitled to considerable weight. He voiced a valid concern about potential relationships with step-siblings. Scott also acknowledged, however, this could be a problem in the event his father remarried.

■ The record of the *in camera* hearing demonstrates that the court did consider the preferences of the children. It appears that the trial court, in fact, properly considered all of the relevant factors set forth in section 602 of the Act. Fortunately, the record indicates that both parents are fit and love their children, and that the children love and care for both their parents. In our opinion, the trial court's award of custody to Gail is not contrary to the manifest weight of the evidence nor does it constitute an abuse of discretion.

## II

Michael contends that the trial court erred in its division of the parties' marital home. Michael argues that the trial court's finding that Michael dissipated the marital home; that the value of the equity in the marital home amounted to $60,000; and the court's order pursuant to its finding of dissipation that Michael pay to Gail $30,000 plus interest as her share of the marital home equity, were contrary to the manifest weight of the evidence.

Gail argues that Michael intentionally dissipated the marital home since he was aware that it could be redeemed from foreclosure and he failed to do so; he had the financial ability to preserve the marital property and he failed to do so; and he did not respond to her offer to share the cost to redeem the property.

Section 503(d)(1) of the Act (Ill. Rev. Stat. 1979, ch. 40, par. 503(d)(1)) permits the trial court, when apportioning marital property,

to consider:

> "*** the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit; ***."

Whether a given course of conduct constitutes dissipation within the meaning of the Act depends on the facts of the particular case. For example, in *Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513, 386 N.E.2d 517, where the husband, at the time he and his wife separated, withdrew a substantial amount from an account held jointly with his wife and used this money to pay child support to his former wife, the court found his dispersion of funds to be for his sole benefit and for a purpose unrelated to the marriage, thus constituting dissipation. In *In re Marriage of Greenberg* (1981), 102 Ill. App. 3d 938, 429 N.E.2d 1334, where the husband, without his wife's permission, and without accounting for the proceeds, sold stocks and bonds jointly held with his wife and sold home furnishings and disposed of the wife's car, the court found dissipation.

In the instant case, Michael obviously derived no personal benefit from the foreclosure of the marital home. It is clear that the foreclosure was not in the best interest of either party. It likewise appears that when Gail was granted temporary maintenance, the court did not specifically order Michael to pay the mortgage but prescribed alternative payments to be made by him. The trial court found, however, that Michael had the financial ability to prevent the foreclosure and failed so to do. This, the court concluded, constituted dissipation. In this instance, we agree.

"The Illinois Marriage and Dissolution of Marriage Act [citation] requires only that evidence of value be introduced and does not require the trial court to determine and articulate an actual value." (*In re Marriage of Sales* (1982), 106 Ill. App. 3d 378, 380, 436 N.E.2d 23, 25.) In dividing marital property, the Act requires only that the trial court consider all relevant factors prescribed in section 503 before exercising its discretion. *In re Marriage of Hyland* (1981), 95 Ill. App. 3d 31, 419 N.E.2d 662.

Except for Gail's testimony, there is no evidence in the record as to the value of the marital home or the amount of balance due on the mortgage. Michael made no objection to this testimony, nor did he present any evidence to contradict the figures used by Gail. The court therefore accepted Gail's testimony and, to achieve an equal division of the equity in the marital home, directed Michael to pay to Gail $30,000 plus interest.

Our review of the total record suggests that the trial court had ample cause for questioning Michael's stated income; its conclusion that Michael's actions constitute dissipation of the marital home; and its determination of the value of the parties' equity. We do not consider these findings to be an abuse of discretion by the trial court or to be against the manifest weight of the evidence. We therefore affirm the trial court's division of marital property.

## III

Michael contends that the trial court's award to Gail of $150 per month maintenance for a period of three years is an abuse of discretion and contrary to the manifest weight of the evidence.[3] Michael argues that Gail is able to support herself through appropriate employment; that the trial court did not consider Michael's ability to meet his own needs; and that the trial court failed to consider the division of marital property in determining the amount of maintenance.

Section 504(a) of the Act provides, in part, that the court may grant maintenance if it finds that the spouse seeking maintenance: (1) lacks sufficient property to provide for his reasonable needs, and (2) is unable to support himself through appropriate employment, or (3) is otherwise without sufficient income. The amount and duration of a maintenance award, without regard to marital misconduct, is to be determined after consideration of all relevant factors, including: (1) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his own needs independently; (2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment; (3) the standard of living established during the marriage; (4) the duration of the marriage; (5) the age and the physical and emotional condition of both parties; and (6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance. Ill. Rev. Stat. 1979, ch. 40, par. 504(b).

The propriety of a maintenance award, as well as the amount of such award, are matters within the sound discretion of the trial court and will not be disturbed on appeal unless it amounts to an abuse of discretion or is against the manifest weight of the evidence (*In re Marriage of Johnson* (1982), 106 Ill. App. 3d 502, 436 N.E.2d 228). Although it is not "necessary for the trial court to designate specifi-

---

[3]The parties do not contest the propriety of the court's order providing for $700 per month child support.

cally the portion of section 504(a) upon which it founded the award of maintenance, the basis for the award must be established in the record." *In re Marriage of McGrew* (1980), 90 Ill. App. 3d 27, 31, 412 N.E.2d 996, 1000.

Here the record discloses that Gail does not possess sufficient liquid assets or marketable skills to provide for her needs. She has only a high school education and she requires refresher courses in business and typing to find appropriate employment. From January 1, 1982, to March 22, 1982, she earned less than $2,000, and her gross income in 1981 was $6,500. Prior to 1981, she had been unemployed for 12 years. Her affidavit averred that her expenses plus those of the children amount to $1,923 per month.

The record discloses that in his 1980 tax return Michael claimed a gross income of $78,840 but a net income of only $20,500.[4] Michael testified that his expenses, including the children's summer camps, are approximately $22,710 per year.

■ In our opinion, the trial court gave due consideration to all of the relevant factors regarding the situations of the parties, including their present and future potential for employment. Accordingly, we conclude that the trial court did not abuse its discretion in awarding to Gail maintenance of $150 per month for a period of three years.

## IV

Finally, Michael contends that the trial court's order directing Michael to pay $9,000 to Gail's attorneys as legal fees is contrary to the manifest weight of the evidence. Michael argues that Gail never proved she was unable to pay her own attorney fees; the trial court failed to consider Michael's financial ability to pay; and the case was not sufficiently complex or unique to warrant fees in the amount of $9,000.

Section 508(a) of the Act provides in part:

"The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order either spouse to pay a reasonable amount for his own costs and attorney's fees and for the costs and attorney's fees necessarily incurred by the other spouse, which award shall be made in connection with the following:

(1) The maintenance or defense of any proceeding under this Act.

---

[4]Again, see paragraph 10 of the trial court's findings to the effect that "his income is greater than he represented and alleged it to be."

(2) The enforcement or modification of any order or judgment under this Act.

(3) The defense of an appeal of any order or judgment under this Act, including the defense of appeals of post-judgment orders.

(4) The maintenance or defense of a petition brought under Section 72 of the Civil Practice Act seeking relief from a final order or judgment under this Act.

(5) The costs and legal services of an attorney rendered in preparation of the commencement of the proceeding brought under this Act." Ill. Rev. Stat. 1979, ch. 40, par. 508(a).

The award of attorney fees in a dissolution proceeding rests in the discretion of the trial court and is not to be disturbed absent an abuse of discretion (*In re Marriage of Keller* (1982), 108 Ill. App. 3d 556, 439 N.E.2d 44). In determining whether the amount of fees awarded is reasonable, the factors to be considered are: "(1) the skill and standing of the attorneys employed; (2) the nature of the controversy, and the novelty and difficulty of the questions at issue; (3) the amount and importance of the subject matter, especially from a family law standpoint; (4) the degree of responsibility involved in the management of the case; (5) the time and labor required; (6) the usual and customary charge in the community; and (7) the benefits resulting to the client." *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1093, 412 N.E.2d 1336, 1348.

In the instant case, the trial court conducted a separate hearing on the issue of attorney fees. The record provides a detailed itemization of the time spent on behalf of Gail and the hourly rates for her attorneys' services. It is, therefore, a sufficient foundation for the award. (*Giamanco v. Giamanco* (1982), 111 Ill. App. 3d 1017, 444 N.E.2d 1090.) Additionally, we note that the dissipation issue might arguably be termed "novel" and that Gail's attorneys allegedly expended time on the foreclosure matter.

An award of attorney fees under section 508 of the Act requires a consideration of the financial resources of the parties and "is justified when the party seeking relief demonstrates financial inability to pay coupled with the ability of the former spouse to do so" (*In re Marriage of Macaluso* (1982), 110 Ill. App. 3d 838, 845, 443 N.E.2d 1, 6). However, financial inability is not to be equated with "destitution." Financial inability for purposes of awarding attorney fees in a divorce proceeding exists where payment of fees would strip the individual of his or her means of support and undermine his or her economic stability. *In re Marriage of Ligas* (1982), 110 Ill. App. 3d 1, 441 N.E.2d

1227; *In re Marriage of Macaluso* (1982), 110 Ill. App. 3d 838, 443 N.E.2d 1.

In the instant case, the record reflects that Michael's net income in 1980 was reported as $20,500, based on a gross income of $78,840. Michael is a practicing attorney with substantial earning capacity and potential. He was able to negotiate a loan in 1981 to purchase a $12,000 car. On the other hand, Gail's gross income in 1981 was $6,500, and between January 1, 1982, and March 22, 1982, her income was less than $2,000. Gail has only a high school education and thus does not have the same earning potential as Michael. Gail receives $700 per month from Michael for the support and maintenance of the two children and $150 per month for her own maintenance. Gail testified that she receives "some money" from her father and from her brother. Even in view of the trial court's order that Michael pay to Gail the sum of $30,000 within five years, Michael's financial resources are sufficiently greater than Gail's to warrant the award of attorney fees against him.

After a review of the total record, we believe that the trial court was aware of the financial situations of the parties and find no abuse of discretion in its order directing Michael to contribute $9,000 to Gail's attorney fees.

For the reasons herein stated, the judgment of the trial court is affirmed.

Affirmed.

STAMOS and DOWNING, JJ., concur.