*In re* MARRIAGE OF SHERRY CALISOFF, Petitioner-Appellee, and CHARLES I. CALISOFF, Respondent-Appellant (Doss, Puchalski & Keenan, Ltd., Cross-Appellant).

First District (1st Division)   No. 86—3604

Opinion filed August 29, 1988.—Rehearing denied December 20, 1988.

QUINLÁN, J., dissenting.

Charles I. Calisoff, of Chicago, appellant *pro se.*

Doss, Puchalski & Keenan, Ltd., of Chicago (Owen L. Doss, of counsel), for appellant Doss, Puchalski & Keenan, Ltd.

Melvyn H. Berks, of Des Plaines, for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

Respondent, Charles I. Calisoff, appeals from the allocation of marital property, liabilities, and attorney fees, as well as the amount of attorney fees and the requirement that he pay maintenance and his children's college expenses, incident to the trial court's judgment dissolving his marriage to petitioner, Sherry Calisoff. One of petitioner's attorneys, Owen Doss of Doss, Puchalski & Keenan, Ltd., filed a cross-appeal in this matter seeking an increase in fees from the $10,000 awarded by the trial court to the $21,396.45 initially requested in his petition. For the following reasons, we affirm in part and reverse and remand in part.

A review of the record discloses that Charles and Sherry were married March 11, 1962, and that Sherry instituted divorce proceedings in January 1982. There were two children both of the marriage: Joy was 19 years old when dissolution was granted and was attending the University of Southern California, and Adam was nearly 17 and had just completed his junior year in high school. The parties were awarded joint custody of Adam with physical possession to petitioner.

Charles, who was 52 years old at the time of dissolution, is an attorney, having received his law degree from Yale University. He has worked as a sole practitioner in the courts of Cook County, Illinois, with a specialization in domestic relations law, for approximately 20 years. He is a member of various matrimonial law committees and a director of others. Charles' adjusted gross income for years 1979 through 1984 was as follows: $81,000, $93,000, $96,000, $62,918, $68,042, and $39,422.

Sherry Calisoff was 47 when the divorce decree was entered. She received a bachelor's degree in education from the University of Michigan in 1960 and taught for a few years thereafter. She subsequently retired from teaching to raise a family. In June 1981, a few months prior to the couple's physical separation, Sherry obtained a certificate as a paralegal from Mallinckrodt College in Wilmette. She commenced

employment as a paralegal, working three to four days per week for one attorney, and free-lancing in the same capacity on the fifth day for other attorneys in the Chicago area. Sherry earned a gross income of $12,483 in 1985, resulting in a net earning after taxes of $9,880. She also grossed approximately $1,000 that same year from her free-lance work. In 1986, her expected net earnings were about $12,000.

Sherry testified that in 1981, 1982, 1983, and 1984 she filed her taxes separately, upon the advice of counsel, after respondent allegedly threatened to stop paying income taxes to force a sale of the marital residence. As a result of respondent's failure to meet his Federal income tax obligations on his individual returns for 1981, 1982, and 1983, a tax lien was filed against the marital home, and his interest in the property was sold to Ohannes Korogluyn. Petitioner then borrowed $40,000 from the First Illinois Bank of Wilmette in order to repurchase respondent's interest from Korogluyn, creating an additional $3,000 plus interest obligation. During the pendency of these proceedings, petitioner also paid real estate taxes on the marital residence of $2,749 in 1983, and $2,508 in 1984.

Respondent denied any intentional reduction in income to inhibit his ability to pay taxes. Rather, he explained that between 1975 and 1980, approximately 75% to 80% of his cases involved child custody matters, in which he either represented a litigant or was appointed by the court to represent minor children. Because he received no such court appointments since 1980, his cases in the area of child custody ultimately diminished to 10% of his workload in 1984. Respondent stated that while in 1980, $75,000 of his fees were generated from these types of cases, in 1984, they only provided $8,000 of his income. He further testified that he informed petitioner of his poor financial condition in January 1981, and in 1984, sought other employment as several letters admitted into evidence reflect.

To sustain his failing practice, respondent borrowed over $90,000 from his parents and other sources throughout the period of 1981 to 1985. Defendant testified that in 1984 he also received loans from his paralegal, Allison Blair, which accounted for the discrepancy between his nonbusiness expenditures and his adjusted gross income that year. It is unclear whether the money respondent received from Ms. Blair constituted his own earned client fees which Ms. Blair was holding during that time or was from her own funds.

On June 13, 1986, the trial court rendered the decree of dissolution appealed from herein. Regarding the division of marital property, the trial judge ordered that Sherry was to receive the marital home in Northbrook, Illinois, worth approximately $132,000 after encum-

brances, together with furniture contained therein valued at $15,000, a 1981 Oldsmobile worth $1,000, stock valued at $900, and investments valued at $20,000. Thus, Sherry received property valued at $168,900. The trial court awarded Charles furniture worth $5,000, his law practice valued at $1,000 pursuant to respondent's post-trial motion, stock valued at $1,890, a coin collection worth $7,500, investments valued at $20,000, and a piano worth $2,000. The total value of these assets was $37,390. In addition, the trial court attributed the following marital assets no longer in existence to respondent: $54,000 on deposit in an HR-10 plan, $8,890 refunded from the Internal Revenue Service, $8,834 from the sale of certain stock, and $35,000 in miscellaneous savings accounts.

The trial court also ruled in its judgment that respondent was to hold petitioner harmless on the obligation due First Illinois Bank of Wilmette and Ohannes Korogluyn, as well as to reimburse petitioner for the 1983 and 1984 real estate taxes. The judgment for dissolution of marriage further requires that respondent pay 75% of the costs incurred in connection with these proceedings totalling $2,564, $12,000 of insurance loans, $832-per-month maintenance for a period of five years, subject to review at the end of two years, $750 per month for child support, all of the children's extraordinary medical and dental expenses through college, and pursuant to post-trial modification, the children's college expenses for four years excluding any grants or scholarships attained by the children as well as their medical insurance during that time. The trial court also ordered respondent to pay his attorney, Seymour Regal, fees of $20,000, in addition to 75% of petitioner's attorney fees totalling $37,500. It is from the above rulings that respondent appeals.

Respondent's initial argument on appeal is that the trial court abused its discretion in dividing the marital assets and liabilities inequitably in favor of petitioner. Specifically, he contends that the trial court ignored his financial contribution to the marriage and failed to adjust the property distribution once the court devaluated his law practice from $69,000 to $1,000 pursuant to his post-trial motion. Particularly in dispute is the trial court's conclusion that respondent dissipated over $100,000 worth of marital property.

■ It is well established that when a dispositional order is entered upon dissolution of a marriage, it must be equitable. (*In re Marriage of Aschwanden* (1980), 82 Ill. 2d 31, 411 N.E.2d 238; *In re Marriage of Goforth* (1984), 121 Ill. App. 3d 673, 459 N.E.2d 1374.) Section 503(c) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 503(c)) (Act) incorporates a partner-

ship theory of marriage, and thus an order disposing of the parties' property should recognize and compensate each party for his or her contribution to the marriage. (*In re Marriage of Goforth* (1984), 121 Ill. App. 3d 673, 459 N.E.2d 1374.) An important objective to be reached by the trial court in entering such an order is to place the parties in a position from which they can begin anew, in addition to providing adequate support for the children. (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 398 N.E.2d 126.) The trial court's decision will not be disturbed absent an abuse of discretion. *In re Marriage of Los* (1985), 136 Ill. App. 3d 26, 482 N.E.2d 1022.

■ Here, the trial court clearly abused its discretion in distributing the marital property and debts between the parties. The trial court awarded petitioner assets worth $168,900, including the marital home, while awarding respondent only $37,390 of assets and requiring him to assume virtually all of the marital debts, totalling nearly $63,000. In addition, respondent is required to pay under the dissolution order $57,500 in attorney fees, $832-per-month maintenance, and college expenses for four years for the parties' two children. Viewing these debts and expenses in light of respondent's current financial condition, respondent cannot possibly meet his own personal obligations, including overdue tax obligations and substantial loan payments. By distributing the marital property and debts in such an inequitable manner, the trial court did not put respondent in a position from which he could start anew, thus violating the principles discussed above. While there is disparity in the parties' earning capacities, it does not warrant granting all the benefits of the marriage to petitioner and imposing all of its burdens on respondent. *In re Marriage of Goforth* (1984), 121 Ill. App. 3d 673, 459 N.E.2d 1374.

The primary basis for the trial court's apportioning a larger percentage of property to petitioner was its finding that respondent had substantially dissipated marital assets. Dissipation is defined as " 'the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' " (*In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 1019, 471 N.E.2d 1008, 1011, quoting Ill. Ann. Stat., ch. 40, par. 503(d)(1), Supp. to Historical and Practice Notes, at 57 (Smith-Hurd Supp. 1984-85).) The trial court in the instant case improperly applied this standard as it did not consider whether the funds in question were expended for a marital purpose.

The record reveals that $54,000 accumulated during the couple's marriage on deposit in an HR-10 plan was seized by the government in 1984 to satisfy respondent's Federal income tax obligation and that

.$8,890 in excess was ultimately returned to respondent, who testified that he deposited said funds in his checking account and used them to pay current taxes, household bills, and office expenses. As noted earlier, petitioner refused to sign joint tax returns in 1981, 1982, 1983, and 1984, thus causing respondent's tax obligation to increase for those years. Unlike *In re Marriage of Siegel* (1984), 123 Ill. App. 3d 710, 463 N.E.2d 773, cited by petitioner, where the court found that one spouse dissipated marital assets by deliberately allowing the marital home to go into foreclosure, respondent here did not have the financial ability to fulfill his income tax obligation which resulted in the lien on the Northbrook home.

The numerous exhibits admitted into evidence disclose that exclusive of his court-ordered obligation in July 1984, respondent voluntarily paid petitioner $34,275 in child support and maintenance, a sum nontaxable to petitioner and nondeductible by respondent, as well as approximately $64,500 in utilities for the marital residence, mortgage payments on the marital residence, gasoline and other auto expenses incurred by both parties, car payments on the 1981 Oldsmobile driven primarily by petitioner, and insurance premiums. Respondent himself incurred over $100,000 in business expenses during that time, including rent, interest on business loans, and secretarial typing. Despite petitioner's assertion to the contrary, it was not dissipation for respondent, as a sole practitioner, to pay his one full-time employee, a paralegal, $225 per week for her services. Moreover, the record reflects that respondent's membership at the Standard Club, which originated in 1963, was for business purposes, as were his three trips to Florida in 1983. In light of this evidence, the lien filed against the marital residence cannot be properly characterized as respondent's dissipation of a marital asset where respondent was financially incapable of satisfying his Federal income tax obligations.

With respect to the $8,800 from the sale of certain stock in 1982, some of which was acquired by respondent prior to the parties' marriage, respondent testified that $4,500 went toward his son's bar mitzvah, $1,500 toward his son's camp, and the remainder was used to pay accrued office rent. Regarding the $35,866 in miscellaneous savings accounts, respondent stated that $9,500 was used to pay a joint obligation of the parties in 1981, $22,244.15 reflected respondent's income from his legal practice rather than marital property and was placed in a savings account for two months in 1983, considerably after the separation of the parties in November 1981, to shield it from the IRS so he could continue to operate his law office and pay family expenses, and that any other balances were either withdrawn by re-

spondent prior to petitioner's request for a divorce on the evening of July 3, 1981, or utilized for family expenses.

In those cases where dissipation of marital assets has been found, the party charged with the dissipation either failed to establish by clear and specific evidence how the funds were spent or utilized them for nonmarital purposes. (See *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 471 N.E.2d 1008; *In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 448 N.E.2d 545; *In re Marriage of Greenberg* (1981), 102 Ill. App. 3d 938, 429 N.E.2d 1334.) In the present case, respondent produced exhaustive proof as to the dispersal of said funds for marital purposes. Consequently, the trial court's finding of dissipation was unwarranted, and the cause must be remanded for a more equitable distribution of marital property and debts between the parties.

Respondent next contends that the trial court's award to petitioner of $832-per-month maintenance for a period of five years, subject to review in two, is an abuse of discretion and contrary to the manifest weight of the evidence.[1] Respondent claims that petitioner, as a "highly educated woman *** who possesses two degrees" and "who has been in the job market," is not entitled to maintenance, and even assuming otherwise, respondent does not possess the financial ability to pay it, particularly in light of his diabetic condition.

■ Section 504(a) of the Act provides, in part, that the court may grant maintenance if it finds that the spouse seeking maintenance lacks sufficient property to provide for her reasonable needs, is unable to support herself through appropriate employment, or is otherwise without sufficient income. (Ill. Rev. Stat. 1985, ch. 40, par. 504(a).) An award of maintenance rests within the sound discretion of the trial court and will not be disturbed on appeal unless the award amounts to an abuse of discretion or is against the manifest weight of the evidence. (*In re Marriage of Siegel* (1984), 123 Ill. App. 3d 710, 463 N.E.2d 773.) In determining the amount and duration of a maintenance award, the trial court should consider all relevant evidence but specifically examine: the parties' financial resources; education; current standard of living; duration of the marriage; and age and physical condition of the parties. *In re Marriage of Wade* (1987), 158 Ill. App. 3d 255, 511 N.E.2d 156.

■ As noted earlier, petitioner is 47 years old, was married to respondent for 19 years, during which time she experienced a high standard of living, and has an income inferior to that of respondent,

---

[1] Respondent does not contest the propriety of the trial court's order providing petitioner with $750-per-month child support.

as is her opportunity to generate a significantly larger future income. As a paralegal, petitioner's earnings are approximately $1,000 per month, while her affidavit averred that her monthly expenses, less those assumed by respondent under the dissolution judgment, are approximately $3,750. While respondent's adjusted gross income in the year prior to trial was approximately $40,000, his earnings in 1981 preceding the couple's separation were $96,000. Thus, the trial court could reasonably infer that respondent's decline in earnings was only a temporary situation which would improve following the divorce proceedings. *In re Marriage of Pahlke* (1987), 154 Ill. App. 3d 256, 507 N.E.2d 71; see also *In re Marriage of Siegel* (1984), 123 Ill. App. 3d 710, 463 N.E.2d 773.

Furthermore, with respect to respondent's health, his own medical expert, Dr. William Fishman, testified that it had no effect upon his current ability to work and earn an income. Finally, the duration and amount of the maintenance payments in this case are subject to review after two years in order for the court to assess the development of petitioner's income and the recovery of respondent's law practice. Under these circumstances, the trial court did not abuse its discretion in granting petitioner maintenance, but the adequacy of the $832-per-month award must be reviewed upon remand after the marital property and debts have been reallocated in accordance with this opinion.

■ Respondent further maintains that the trial court abused its discretion in making him solely responsible for his children's college expenses for four years, excluding grants or scholarships. He contends that the trial court did not take into account his adverse financial position after the disposition of marital property and petitioner's ability to contribute to such education. We agree.

Section 513 of the Act directs the court to consider all relevant factors in making an award for the education and maintenance of a child, including:

"(a) The financial resources of both parents.

(b) The standard of living the child would have enjoyed had the marriage not been dissolved.

(c) The financial resources of the child." (Ill. Rev. Stat. 1985, ch. 40, par. 513.)

Referring to this provision, the supreme court commented in *In re Support of Pearson* (1986), 111 Ill. 2d 545, 551, 490 N.E.2d 1274, 1277:

"This section does not mandate that divorced parents must in all cases provide their children with funds for post-high-school education."

The court further stated:

> "The court should not order a party to pay more for educational expenses than he or she can afford. [Citation.] A party's ability to pay must be evaluated with regard to the party's resources at the time of the hearing. [Citation.]" 111 Ill. 2d at 552, 490 N.E.2d at 1277.

In the case at bar, both children currently attend the University of Southern California, although at the time of dissolution, Adam Calisoff was still in high school. According to a letter dated July 24, 1986, written by petitioner, Joy Calisoff received $10,390 in scholarship aid from the University of Southern California for the 1986-87 school year, making respondent's contribution $6,502, exclusive of $3,409 for first semester expenses, including plane fare, rent, meal plan, books, health insurance, and living expenses. Based on this information, we can reasonably infer that college tuition and expenses for Adam, who is not under scholarship, total roughly $20,000. Given the current distribution of marital property and liabilities as well as respondent's limited financial resources, requiring respondent to bear the sole burden of these costs is unreasonable and imposes upon him an obligation which he cannot possibly perform and must be reversed. Thus, if any college expenses are in fact assessed against the parties as discussed below, the trial court may, in its discretion, order contribution from petitioner upon remand.

In determining the respective responsibility of each party, the trial court should consider the children's access to less expensive academic institutions comparable to the University of Southern California. As noted in *In re Marriage of Booth* (1970), 122 Ill. App. 2d 1, 6, 258 N.E.2d 834, 836-37:

> "Many families have insufficient incomes to endow their children with the good fortune of a college education, but their children have obtained scholarships, loans for education or have been employed so as to attain the requisite funds to finance their college education. They go to state or city universities where tuition is lower than in the private out-of-state colleges. Parents are often called upon to make sacrifices to obtain a college education for their children. But the children must also cooperate to lessen the burden to their parents in whatever way they can."

Similarly, here, while $6,500 may be equivalent to the annual tuition and expenses at an in-State university, $20,000 is not. Therefore, the children themselves have an obligation to lessen their parents' financial burden in this regard.

The final point of contention between these parties is the amount of fees awarded to all three attorneys, and the trial court's decision that respondent is responsible for 75% of petitioner's attorney fees. Specifically, respondent was ordered to pay his own attorney, Seymour Regal, fees of $20,000, and petitioner's attorneys, Owen Doss and Melvyn Berks, fees of $7,500 and $30,000, respectively. Respondent argues that not only is he unable to pay these fees, but also that the cause was not sufficiently complex to warrant such excessive fees.

■ In determining whether the amount of attorney fees awarded is reasonable, the factors to be considered are: "(1) the skill and standing of the attorneys employed; (2) the nature of the controversy, and the novelty and difficulty of the questions at issue; (3) the amount and importance of the subject matter, especially from a family law standpoint; (4) the degree of responsibility involved in the management of the case; (5) the time and labor required; (6) the usual and customary charge in the community; and (7) the benefits resulting to the client." *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1093, 412 N.E.2d 1336, 1348.

■ In the instant case, there is nothing in the record to indicate that the amount of attorney fees awarded was unreasonable. The trial court conducted a separate hearing on the issue, and all three attorneys stipulated that a reasonable rate for attorneys of their expertise and experience in Chicago would be $125 per hour. Moreover, respondent was unable to refute the substantial amount of time the attorneys devoted to this matter, some of which was due to respondent's own actions during these proceedings.

■ Despite the reasonableness of the fees charged, we believe that assessing 75% of petitioner's fees against respondent was improper. Section 508(a) of the Act provides that the trial court may order either party to pay a reasonable amount for attorney fees necessarily incurred by the other party in any proceeding under the Act. (Ill. Rev. Stat. 1985, ch. 40, par. 508(a).) An award of attorney fees is justified where the spouse seeking relief demonstrates (1) financial inability to pay, and (2) the ability of the other spouse to pay. (*In re Marriage of Ryan* (1985), 138 Ill. App. 3d 1077, 487 N.E.2d 61.) Financial inability exists where payment would strip the person of the means of support and undermine his economic stability. (*In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 441 N.E.2d 1254.) The trial court's decision will not be disturbed absent a clear abuse of discretion. *In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 453 N.E.2d 866.

Again, upon review of respondent's financial position, requiring

him to pay $37,500 of petitioner's attorney fees, in addition to $20,000 of his own, will strip him of his means of support and undermine his economic stability. Given petitioner's income from both maintenance and employment as well as her academic background, we see no reason that petitioner cannot contribute more than 25% to her own attorney fees after redistribution of the marital property and debts.

Since the amount of attorney fees awarded was supported by the evidence, there appears to be no merit to Mr. Doss' cross-appeal for increased fees.

For the foregoing reasons, we affirm a maintenance award to petitioner and the amount of attorney fees, but reverse and remand with respect to the amount of maintenance and the allocation of property, debts, attorney fees, and college expenses, if any.

Affirmed in part; reversed and remanded in part.

O'Connor, J., concurs.

JUSTICE QUINLAN, dissenting:

I cannot agree with the majority opinion, which reverses and remands this case to the trial court for a redetermination of the allocation of property and debts, maintenance, attorney fees, and college expenses originally made by the trial court. I would affirm the judgment of the trial court in its entirety. As the majority itself initially notes, the findings of the trial court in this type of case will not be disturbed absent a clear abuse of discretion. (*In re Marriage of Pahlke* (1987), 154 Ill. App. 3d 256, 507 N.E.2d 71.) I do not find that the trial judge abused his discretion as to the resolution of the above matters in this case. To reverse this case for further proceedings is contrary to the interests of judicial economy.

The majority specifically bases its reversal on what it contends was the trial judge's erroneous finding that the respondent had dissipated certain of the marital assets. This finding was erroneous, the majority states, because the respondent had supplied the court with "exhaustive proof as to the dispersal of said funds for marital purposes." (176 Ill. App. 3d at 728.) However, this "exhaustive proof" of the respondent's payments of expenses is based almost exclusively on respondent's self-serving statements and a check register prepared by respondent, since respondent, although an experienced and successful matrimonial attorney himself, maintained no business records. On the other hand, I believe that the other proper evidence presented to the

trial court provided a valid factual basis for the trial court's finding that the respondent had dissipated the marital assets.

The evidence presented by the petitioner, Sherry Calisoff, established that respondent failed to pay personal income tax obligations which resulted in a Federal tax lien on the marital home in which petitioner and the children resided. This lien ultimately resulted in a forced tax sale of the home, which required the petitioner to subsequently repurchase the home from the tax buyer, and, in order to do this, she had to take a loan of $40,000 and incur an interest obligation of an additional $3,000. The respondent had, Sherry Calisoff testified, threatened this very action when she told him she wanted a divorce in July 1981. At that time, he said he would stop paying his taxes and cause her and the children to lose the marital home. This is, of course, exactly what happened. Thus, after the house had been repurchased, and during the pendency of these proceedings, the petitioner paid the real estate taxes on the home herself.

Although respondent denied that he intentionally reduced his income to avoid paying his taxes or to decrease petitioner's settlement award, the evidence clearly shows that respondent's adjusted gross income, after the divorce papers were filed in 1982, dropped by over $30,000, despite a steady increase in his adjusted gross income in the prior years. His business expenditures, however, during this same period, continued to increase and became a larger percentage of his gross income. While this phenomenon was taking place, the evidence further established that the respondent began receiving a substantial amount of "loans," from his parents, and from his paralegal and purported girlfriend, Ms. Blair. Furthermore, regarding the monies allegedly loaned by Ms. Blair, even the majority notes that "[i]t is unclear whether the money [which] respondent received from Ms. Blair constituted his [respondent's] own earned client fees which Ms. Blair was holding during that time or [whether the loans were] from her own funds." (176 Ill. App. 3d at 724.) Accordingly, there is evidence from which the trial court could have concluded that these loans were really a subterfuge to hide his income. In fact, respondent himself later, as noted by the majority, admitted that on occasion he had manipulated transfers of funds to hide them from the IRS. 176 Ill. App. 3d at 727.

Nevertheless, respondent claims that it was these "loans" that provided the monies necessary to meet the discrepancy between his adjusted gross income and his nonbusiness expenditures. It was also these loans, he testified, that allowed him to continue his memberships in the Standard Club, and other clubs, pay for his "business

trips" to Florida, and to pay $78,543.61 of business expenses in 1984 when he allegedly earned only $39,422. But, even with these loans, that assertedly allowed him to pay his nonbusiness expenses, he says he could not pay his income taxes. As a result of respondent's failure to pay his Federal taxes, the monies contained in the parties' HR-10 fund accumulated during the marriage, amounting to approximately $54,000, were taken by the government to satisfy respondent's personal tax obligations. Interestingly, prior to the separation, the respondent had faithfully paid his taxes on time by making appropriate payments as required to the Federal and State governments each year. Furthermore, during this same period, substantial funds in different savings bank accounts accumulated during the marriage were individually utilized by respondent. The bulk of the funds were dispersed into a business checking account of respondent and expended by him for his own purposes. Based upon these and other facts presented,[2] I believe the trial court, which viewed the evidence and the parties first hand, had a valid basis for its finding that respondent had dissipated marital assets. Under the circumstances here, I find it incredulous that the majority holds that the meager, self-serving evidence presented by respondent met the standard of proof required and established that he had properly spent these funds.

As this court stated in *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 471 N.E.2d 1008, "the person charged with the dissipation [of marital assets] is under an obligation to establish by clear and specific evidence how the funds were spent. General and vague statements that the funds were spent on marital expenses or to pay bills are inadequate to avoid a finding of dissipation." (*In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 1022, 471 N.E.2d 1008, 1013.) It can hardly be argued here that the "proof" offered by respondent met this standard.

In addition to the proper finding regarding dissipation, I believe that the trial court, based on the facts and circumstances, also properly and equitably allocated the assets and liabilities. The allocation of marital assets must be equitable, but it need not be an equal division, and the court may properly award one spouse a greater amount, if the relevant factors warrant such a division. (*In re Marriage of Rossi* (1983), 113 Ill. App. 3d 55, 446 N.E.2d 1198; see Ill. Rev. Stat. 1985,

[2]There was also evidence that dividends of certain Abbell investments, jointly owned, were kept and utilized solely by respondent, that an auto insurance settlement received by Sherry Calisoff was deposited by and used by respondent, and, petitioner further asserted, that a hospital insurance settlement of a medical claim of hers was also kept by respondent.

ch. 40, par. 503.) The relevant factors in the situation here support the trial court's allocation of assets and liabilities. The respondent is clearly in a superior financial position, with a superior earning capability as compared to the petitioner. The respondent enjoyed a "lucrative matrimonial practice" while the petitioner, after receiving a bachelor's degree in education in 1960, had taught for only a few years before her marriage and spent the next 19 years as wife, homemaker and mother. In 1981, petitioner received a certificate as a paralegal and returned to the work force when the marriage was breaking up. The respondent, conversely, had graduated from Yale Law School in 1962, continuously practiced law for 25 years, specializing in domestic relations law, and, as respondent himself had testified, achieved a substantial prominence in the field, earning over $150,000 immediately prior to the separation.[3] Moreover, petitioner only worked three or four days a week and did not even anticipate earning more than $12,000 a year. Furthermore, as the trial court specifically found, the respondent had dissipated the marital assets, and his asserted recent substantial decrease in his income was either "by design," or was merely a "temporary set-back." These facts provided an additional basis, in my opinion, for the court's allocation of the assets and liabilities.[4] I find no abuse of discretion in the trial court's distribution of the marital property and debts between the parties here in such a situation.

I further believe that the trial court's award of maintenance in the amount of $832 per month was proper and in accordance with section 504(a) of Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 504(a)), as well as the case of *In re Marriage of Wade* (1987), 158 Ill. App. 3d 255, 511 N.E.2d 156, relied on in the majority opinion. The majority itself believes that the disparate circumstances between the parties warranted a maintenance award and only takes exception with the amount of the award. However, as the majority notes, this award is subject to review after two years,

---

[3]It is interesting to note that the respondent's adjusted gross income for the years immediately prior to the separation was in 1979, $81,441; in 1980, $93,000; and in 1981, $95,863; and, after the separation, in 1982, $62,918; in 1983, $69,042; and in 1984, $49,422. The divorce proceedings were instituted by petitioner in January 1982 and continued through 1984.

[4]Actually, the initial distribution of assets by the court resulted in the petitioner receiving approximately 56½% of the marital property and, only by subsequently giving minimal value or no value to respondent's law practice was there any great disparity in the percentages of the marital property distributed to the parties. Nevertheless, the distribution remained fair under the circumstances presented here.

and thus, at that time, if the petitioner is back on her feet financially, the court could modify the amount of maintenance, if justified. Consequently, I find no abuse of discretion by the trial judge in this regard either.

Concerning the payment of the children's college expenses, I also believe that the trial court did not abuse its discretion when it ordered respondent to pay the children's college expenses at the University of Southern California. It is apparent that the Calisoff family had enjoyed a high standard of living prior to the divorce. Furthermore, at that time of the divorce, Joy was already attending the University of Southern California, and Adam was a junior in high school. Presently, both children are enrolled at the University of Southern California, but, as noted in the majority opinion, for the year 1986-87, Joy received a substantial scholarship award from the university. Thus, given the fact of the respondent's proven earning capabilities, and the fact that he had experienced what appears, from the evidence, to be only a temporary reversal in his earnings, it was not unreasonable for the court to require respondent to pay these expenses. Petitioner clearly does not have sufficient funds to pay for the children's schooling based on her meager earnings. On the other hand, the respondent, who has had a successful law practice for years, a practice that enabled him and his family to maintain a high living standard during the marriage, should be able to continue to meet his obligations, including those for the children's schooling at the University of Southern California. The trial court is, as recognized by the majority, accorded discretion in requiring parents to pay for their children's college expenses. (*In re Support of Pearson* (1986), 111 Ill. 2d 545, 490 N.E.2d 1274.) Consequently, the trial court here, based on its findings of fact, the record presented, and the prior marital history of the parties, had a reasonable basis for ordering respondent to pay the college expenses of the two children, and did not, in my judgment, abuse its discretion. Additionally, this award is also subject to review, if circumstances should radically change.

Finally, the trial court's allocation of attorney fees, which required the respondent to pay 75% of the petitioner's fee, was not, I believe, unreasonable. Again, in light of the trial court's findings of fact, no abuse of discretion occurred here. The majority opinion itself finds, and I agree, that the amount of fees was reasonable. Thus, in light of the great disparate financial resources and earning potential of the parties, the allocation of petitioner's fees to the respondent here, I believe, was proper. (See *In re Marriage of Pahlke* (1987), 154 Ill. App. 3d 256, 507 N.E.2d 71.) Additionally, I believe that the trial court's

determination was especially proper in this case, where the evidence clearly permits the conclusion that the respondent did everything he could to make the marital dissolution more difficult, including dissipating marital funds, concealing assets, and to a large extent, extending, unnecessarily, the proceedings at trial by his recalcitrant and uncooperative behavior.

For these reasons, I would affirm the decision of the trial court in its entirety.