NOTICE

Decision filed 06/29/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190100-U

NO. 5-19-0100

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| TOMMY J. LAWLESS, | ) | Jackson County. |
| | ) | |
|     Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 15-D-20 |
| | ) | |
| REMONA LAWLESS, | ) | Honorable |
| | ) | Michael A. Fiello, |
|     Respondent-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The orders of the circuit court of Jackson County are affirmed where the court did not abuse its discretion in its distribution of marital assets and calculation of sanctions.

¶ 2    This appeal arises from a judgment of dissolution of marriage entered by the Jackson County circuit court on December 12, 2018. The petitioner, Tommy Lawless, filed for dissolution of marriage against the respondent, Remona Lawless, seeking to dissolve their second marriage to one another. Following a trial, the court entered judgment awarding

1

the petitioner a total of $443,716.61, and the respondent a total of $510,574.26. The petitioner appeals.

¶ 3                                I. BACKGROUND

¶ 4     On January 29, 2015, the petitioner filed a petition for dissolution of marriage in the circuit court of Jackson County. This was the second time the parties were married and sought dissolution of their marriage.

¶ 5     On October 1 and 2, 2018, a trial was held on the petition for dissolution of marriage. The respondent testified that she was 59 years old and residing at 11 Ash Road in Ava, Illinois. She had lived at this residence for over 20 years. She and the petitioner shared one child, Tomiya Lawless. The respondent's last place of employment was Menard Correctional Facility. She and the petitioner were previously married in 1977 and subsequently divorced in 1991. In the first divorce decree, the respondent was awarded their residence in Lenzburg. In 1995, she sold that property for $58,000. The money from the sale of the Lenzburg property was deposited into a bank account held by the petitioner. At the time she sold the property, there was no mortgage on it. The home was titled solely in the petitioner's name despite having been awarded to her in the dissolution of their first marriage. She was unaware that the property was titled to him.

¶ 6     The parties were married a second time on September 15, 2008. The $58,000 received from the sale of the Lenzburg property was used to buy the Ava property. At the time of purchase, the Ava property had a dilapidated shack standing on it, which was torn down. She and the petitioner then built a home and a cabin on the property. All of the proceeds from the sale of the Lenzburg property were invested into the Ava property. They

2

both physically contributed to the work done in building the Ava home. She designed the home and also contributed in manual labor. At this time, she was also working as a jailhouse nurse at the St. Clair County jail and at a Jackson County nursing home. The petitioner was working at the Department of Corrections (DOC). Shortly after they were married the second time, the marriage began to break down due to the petitioner being "an extreme alcoholic."

¶ 7    The petitioner was arrested for five DUIs and served six months in the Randolph County jail. The parties physically separated on December 9, 2014, or shortly thereafter.

¶ 8    On June 9, 2009, the respondent had her hysterectomy surgery at Carbondale Hospital. The petitioner knew about the surgery and visited her at Carbondale Hospital. She was out of work from June 2009 through October 2, 2014, and received worker's compensation that amounted to 66.66% of her salary. She is not currently employed and receives Social Security disability benefits.

¶ 9    The respondent sought an order of protection against the petitioner in December 2014. The order of protection arose from an incident where the petitioner tore down the Christmas tree in the living room while he was intoxicated. The respondent was leaving for work and could see through the living room window that, as she was pulling out of the driveway, he had begun to tear up the tree. When she returned home from work that night, the petitioner was waiting for her, and they immediately began fighting and arguing. She tried to run away from him, so he grabbed her by the arm and choked her. She got away and ran out the front door. He then began tearing up the furniture. He threatened to shoot her, kill her, and burn the house down. She went down the road and called Jackson County

3

authorities, who were dispatched to the residence. Because the petitioner was too intoxicated to drive, they told the respondent that she needed to leave the residence for the night and let the petitioner sleep it off. She got in her vehicle, drove to First Apostolic church in Ava, and slept for a couple of hours in her car while parked in the church parking lot. The next morning, she was granted an order of protection. There was a trial on the order of protection, and the court entered a two-year term order of protection.

¶ 10 Once the petitioner was removed from the home, the respondent returned and has since been solely responsible for the upkeep of the house including the $1500 monthly mortgage payment. In May 1996, the respondent purchased the property located at 11 Ash Road in Ava. The parties stipulated that the Ash property was marital. The purchase price of the Ash property was $78,500. At the time of purchase there was a dilapidated shack located on the property, but she and the petitioner eventually built a home on the Ash property. The couple hired contractors but did a large portion of the labor themselves.

¶ 11 At that time, she was working at Menard Correctional Facility and making a salary between $38,000 and $40,000. In 2009, she went in for hysterectomy surgery. During surgery, her bowel was perforated, and the injuries she suffered eventually led to a medical malpractice settlement in the amount of $825,000. She was limited in that she could not eat a full meal, she could not eat fried food very well, and she could not eat some wheat products due to developing celiac disease. She also had physical limitations and had to leave her job because she could not carry 10 pounds for 20 yards.

¶ 12 After the surgery, the respondent began receiving worker's compensation for a couple of years until she started receiving medical disability in 2011. She received the

settlement money in January 2014. The money was deposited into the respondent's bank account. She received three wire transfers from her attorney in the amounts of $65,197.97; $7478; and $200,000. There was another $100,000 deposited into a different bank account held by the respondent. A $200,000 deposit was wired to a Banterra Bank account held by the respondent and her friend, Rhonda Jones. She previously had three safety deposit boxes; Jones was also listed on one of the safety deposit boxes. Jones never withdrew any money from the bank account, nor did she access the safety deposit box without the respondent being present. The respondent had visited all three safety deposit boxes before they were scheduled to be inventoried in relation to the dissolution proceedings. She invested $10,000 for each of her grandchildren from her settlement money. The respondent also originally invested $60,000 for her daughter, but she later withdrew that money and used it as a vacation fund. She invested $40,000 with Michael Howell for herself. She disclosed in a financial affidavit that she had $400,000 of her settlement remaining. At the time of the disclosure she was renting the cabin located on the Ash property to Greg Vancil, but he was not paying any rent as he did not have a job.

¶ 13    In December, the respondent paid for her and Vancil to take a trip to Las Vegas, Nevada. The total cost of the trip was around $20,000. In April 2016, they both went to Florida to visit Disney World. Vancil paid for the park tickets on his mother's credit card, and the respondent reimbursed him in cash. Vancil resided in the cabin on the Ash property for approximately one year without paying rent. While he was living in the cabin, the respondent would pay him for his handyman services. After Vancil, Gary Elbrecht resided

5

in the cabin and was supposed to provide repair services but failed to do so and did not pay rent to the respondent.

¶ 14    The respondent took a trip to Costa Rica on behalf of the educational services for Du Quoin and several school districts. She paid for Jones to attend this trip with her. She received $1500 annually from a local farmer to farm the land she owned. She reported that she received a pension and other retirement benefits as well as Social Security as her gross monthly income. She also had investment income and $272,000 in cash in a safety deposit box.

¶ 15    The parties stipulated to the following regarding the property located at 73 Morber Road. The property was purchased for $100,000. It was titled to Shirley McCoy; however, it was owned by the respondent and any proceeds from a sale would go to her. The property was therefore subject to the trial court's discretion as marital property. The respondent testified that the money for the purchase came from the safety deposit box that contained money from her settlement. The property was being rented for $550 per month, and she received a portion of that rent. There was no mortgage on the Morber property, but the Ash property had a home equity loan on it in the amount of $20,000. She was in possession of the Ash property. She was given possession when she was granted an order of protection against the petitioner.

¶ 16    There were several firearms owned by the parties, some of which were pawned by the petitioner and some that were thrown into the river by the respondent.

¶ 17    Shirley McCoy testified that she had resided at 256 Ash Road in Anna for approximately 18 years. She was retired but owned rental properties and an antique shop

with her sister. She was given money by the respondent to purchase the property on Morber Road. The respondent had no previous experience with owning rental properties and "already had enough on her plate." The respondent accompanied her to the auction to purchase the property. The money for the purchase came from the respondent's injury settlement and was not McCoy's money. The property was in her name but belonged to the respondent. Though the property was not rented at the time of her testimony, it had been previously rented for $550 per month. She received $50 of the rent paid and approximately $350 went to the respondent. The rest went to insurance and taxes. The property was under contract to sell for $127,000. If the trial court were to approve the sale, it was her approximation that the respondent would receive a net amount of $20,000. She would receive 10% of the net profit of the sale. The original intent was that the two women would purchase the home and "flip it." She testified that she told the respondent that she needed some sort of ownership interest in the home so the house was purchased with the respondent's funds and put in McCoy's name, and she would act as the rental agent. There was no written agreement regarding this arrangement.

¶ 18 Zandra Schellenger testified that she met the respondent in 2015 through McCoy. For about one year, the three women spent time together and had dinner together almost every night. Early in the relationship, the respondent told Schellenger that she was divorcing her husband. Schellenger spoke to the respondent about reconsidering the divorce, but she absolutely did not want to get back with her husband. The respondent told her that she was delaying the divorce case. It was her opinion that Greg Vancil was in a romantic relationship with the respondent, and they appeared to be a couple. She herself

7

had previously dated the petitioner starting in approximately July or August 2016 for roughly one year. McCoy told her that she was going to buy the property on Morber Road.

¶ 19 The petitioner testified that he was retired and received approximately $4000 per month in income from said retirement. He spent six months in jail for the conviction of driving under the influence (DUI). He also had two previous DUIs. The respondent encouraged him to retire because she was going to receive some kind of settlement. The couple first separated in the early nineties but eventually reunited. They were remarried in 2008. They cohabitated for almost the entire time between their first and second marriages but were separated for three months in 1991.

¶ 20 The petitioner testified that the Lenzburg property awarded to the respondent in their first divorce sold for $58,000. At the time of the sale, it had roughly a $20,000 mortgage that was paid with the proceeds of the sale. The Ash Road property was then purchased, and it had an $80,000 mortgage. There was a down payment between $10,000 and $20,000 paid on the Ash property. As of September 22, 2018, $51,871 was owed on the Ash mortgage. He requested an appraisal on the property, and it was valued at $365,000. There was a home equity line of credit on the property for $20,000. There is tillable land on the Ash property that was being farmed by Aaron Wilson, and Wilson paid him a flat rate of $1500 to farm the land.

¶ 21 In 2009, the petitioner opened TNT Outdoors in Ava. It was a bait, tackle, and archery shop. The petitioner operated it for four years before it burned down. There was a debt in the amount of $15,000 that remained after the fire because he did not have

8

insurance on the inventory. When he sold the land, he used the proceeds to pay the debt and the difference came out even.

¶ 22 With regard to the respondent's surgery, the petitioner received a call from one of the respondent's friends telling him she was in a bad way. He went to the hospital in Carbondale and stayed there with her for three to four days. She was transferred to St. Louis University Hospital, but he did not go with her in the helicopter and instead drove there from Carbondale. He traveled back and forth during her stay at St. Louis University Hospital. He became aware that the respondent would be filing a personal injury case when they went to speak with a lawyer. He did not find out that she had settled the suit until one year into the divorce proceedings. After the injury, she did not return to her job at the DOC. She did go work for an older couple that was living on the Morber Road property. Her household income was reduced as a result of her inability to return to her employment, and he began to supplement her income.

¶ 23 The petitioner denied that the respondent ever gave him $120,000 after the settlement was paid and said that the most she ever gave him was a few hundred dollars to pay bills. At some point he discovered that she had opened a separate P.O. Box. He was prohibited by an order of protection from entering the Ash Road property. He was able to enter the property with an attorney to inventory the residence. He found that a 650 Kawasaki four-wheeler, a fence post, and some small tools were missing.

¶ 24 For a while after the surgery, the respondent was unable to perform normal life functions. When she stopped working at the DOC, the household income reduced by approximately $20,000 to $25,000.

¶ 25 The petitioner became aware that the respondent was buying the Morber Road property when he saw her with McCoy at the auction. He built the property on Ash Road with the help of friends. He did all of the maintenance and upkeep of the residence the entire time he lived there. He has acknowledged having a drinking problem but denied ever hitting his wife or drinking so much that he could not remember.

¶ 26 The petitioner receives approximately $4300 per month in retirement. He can work but is retired. He does not have a driver's license. Six months ago, when he went to jail, the respondent took over the $300 per month payments for the home equity loan and had made the $1500 per month mortgage payment on the Ash property since the separation.

¶ 27 Several years ago, a weapon accidentally discharged inside their home, and the projectile struck a baseboard along the bottom of a wall. This was the only time a firearm was discharged inside the Ash residence, and the respondent was not home when the gun went off. He sold one Magnum .44-caliber pistol revolver to the Hick's Trading Post but denied ever pawning weapons.

¶ 28 Since the separation, the petitioner has not contributed to the payment of the taxes, insurance, or upkeep on the Ash property. The respondent told him that she was expecting a settlement in spring of 2014 despite having already received the settlement in January of that year. The first discussion of a possible lawsuit occurred at St. Louis University Hospital. Prior to the lawsuit being filed, he learned that she had hired an attorney out of East St. Louis to handle her case. He never sought any legal advice concerning the injury and any claim he could bring as a result of the injury. He was unaware of any problems the respondent suffered prior to and resulting in the hysterectomy.

10

¶ 29    Gary Elbrecht testified that he resided in Murphysboro and rented the cabin on the Ash Road property for two months and paid $200 per month in rent to the respondent. She paid him to do handyman work around the property. She would give him a check for more than the amount she owed him and then would have him cash the check and return the excess to her. This occurred four or five times. He was evicted from the property because she claimed he was entertaining too much company and not paying rent. He used narcotics including cocaine, marijuana, "speeder" pills, and methamphetamine. He has a criminal record that includes a misdemeanor in St. Clair County and a felony conviction for fleeing and eluding.

¶ 30    The parties' daughter, Tomiya Lawless, testified that she used to work at her father's store in Ava. She recalled some antique-style wooden furniture that was delivered to the house including a bedroom set. She used methamphetamine for six to nine months in 2003. Her reason for going to the property was to remove items from the property. She did not own the fishing boat. She took the fishing boat from the Ash property when her mother was not present and after the order of protection was in force. She denied taking the fence post and table saw. She has had several physical altercations with her mother. The last physical altercation was in April 2015. During the altercation, she pushed her mother down. As a result, she sought a restraining order against her mother. She had not socialized with her mother in four years. Prior to the falling out, she would occasionally purchase from and smoke marijuana with her mother. In the last five years, she has only smoked marijuana. Prior to that, she was addicted to methamphetamine. She occasionally consumes alcohol with her father. Her father is an alcoholic, and she has been around him

11

when he was intoxicated, including twice during the previous year. The intoxication affects his behavior in that he gets "funny," louder, more boisterous, difficult to others, and occasionally sad.

¶ 31 In the judgment of dissolution of marriage from the first marriage at page 2, section D, the respondent was awarded "the marital home at 10 South Main, Lenzburg, Illinois." After the 1991 judgment was entered, the respondent assumed and paid all mortgage payments on the property. There was personal property that was given to her prior to her second marriage to the petitioner, including: items she inherited after her sister died, items she inherited after her brother died, items she inherited after her father died, items she inherited after her grandmother died, gifts from her mother, kitchen appliances she received as gifts, a 2014 Toyota Venza that she purchased when her pickup truck broke down, and other various items she purchased prior to the second marriage. There was also a handgun and a shotgun that she asked be awarded to her so she could protect herself from the petitioner "and his cohorts." She admitted to disposing of some of the guns they had during the marriage including four long-barrel shotguns, two .22-caliber rifles, a shotgun, and a handgun, which she threw in the Mississippi River because the petitioner had previously shot at her in their home on two separate occasions, and she did not want to be shot at again. She further testified that he put his fist through several doors, resulting in the bedroom door being replaced three times (including the molding), and the bathroom door being replaced twice.

¶ 32 The petitioner violated the order of protection twice in the first week it was in effect and drove his truck down Ash Road, which leads to a parking lot, where he would park and

use binoculars to watch the respondent. He did this a dozen times, and she feared for her safety. She had an appraisal done, and the property on Ash Road was valued at $320,000. Since that appraisal, she spent between $7000 and $8000 on basement repairs, $16,000 on a new roof, close to $8000 on repairs to the porch, $5000 to paint and repair the shed and barn, $1500 on the septic tank, $6400 on plumbing repairs, $3000 on the maintenance and repair of kennels, $8000 in tree removal, $9000 in repairs to the cabin, $327 to redo the wood stove in the cabin, and $8000 on repairs to the bay windows from storm damage, in addition to the cost of regular maintenance. All of the money for these repairs came from her medical settlement. She received an insurance check for the damage to the basement in the amount of $2000; however, that money was put toward the principal of the mortgage and was not part of her calculations regarding the cost of repairs and upkeep. As of January 2014, there was $97,920.92 owed on the mortgage. She made all the mortgage payments since the time of the separation. At the time of the trial on the parties' dissolution, the balance on the mortgage was $51,000.

¶ 33    She owned the Morber property in McCoy's name. She paid $100,000 for the property and used the money from her settlement for the purchase. At the time of her testimony, the property was under contract to sell, and she expected a net profit of $10,000 from the sale.

¶ 34    Of the $825,000 settlement, she received a total disbursement of $555,285.97. The remaining funds from her settlement included $110,000 at Murphy-Wall Bank, $10,000 in a safety deposit box at Campbell Hill Bank, approximately $2000 in her checking account, and $342 plus change in a savings account at Campbell Hill. She had $10,000 invested for

13

each of her grandchildren, $20,000 total. She spent "a couple thousand dollars" of her settlement money to host a retirement party for the petitioner on March 31, 2014. Additionally, in 2014, on more than one occasion, she gave the petitioner between $15,000 and $20,000 in cash for payment of various financial or legal obligations. The petitioner spent large amounts of money on alcohol, and during the pendency of the case, he lived in an apartment above Gabby's in Ava, a local drinking establishment.

¶ 35   She spent $5655 of her settlement money on Jones and herself for a vacation to Costa Rica to help children through the Du Quoin school system.

¶ 36   After her daughter stole personal property from her, she was advised by Jackson County that if she knew the location of the stolen property, she should go and photograph it. She therefore went to her daughter's property to take photographs, and her daughter attacked her by punching her in the chest, kneeing her in the stomach, grabbing her hair, and pushing her to the ground.

¶ 37   The respondent's monthly expenses exceeded her income from Social Security and her pension. Her Social Security benefits required her to attend periodic medical testing. On March 27, 2017, she was examined by Dr. Craig Furry, after which he concluded that the respondent "is not able to perform the duties of her previous job due to the medical problems explained above." Additionally, he concluded that he "[did] not feel she would be able to work in any job function due to [the] chronicity of her diarrhea[,] the underlying stress that this problem brings[, and that the] range of motion of her spine also limits her ability to work and the torn rotator cuff prevents her from using her right upper extremity."

14

As a result of her ongoing medical issues, she spent $1000 each month on prescription medications. She contributed to the archery, tackle, and bait store by paying its bills.

¶ 38 The respondent rented the cabin located on the Ash property to Greg Vancil in exchange for his manual labor in upkeeping the property. He lived there for six months before she evicted him. There was a second mortgage on the Ash property in the amount of $20,000. The monthly payments from that lien were automatically withdrawn from the petitioner's pension, enabling him to immediately withdraw the payment amount from the home equity loan, resulting in no reduction in the amount of the loan. Since the separation, the amount of that loan has remained the same. The only time the payments were made and not immediately re-withdrawn was the six months when the petitioner was incarcerated.

¶ 39 Joyce Maynard, the respondent's mother, testified that she lived with the parties off and on for five years beginning in 2010. On two different occasions, she witnessed the petitioner fire a gun in the house during an argument.

¶ 40 Guice Strong, the petitioner's previous counsel, testified as to the extra time and work he had to invest in the case due to the respondent's violation of the rules of discovery.

¶ 41 On December 12, 2018, the trial court entered a judgment of dissolution of marriage. In relevant part, the court found that:

> "Both parties contributed to the acquisition, preservation, or increase or decrease in value of the marital property. With regard to the Ash Road property, there was a period of time when the parties were together when [the] Respondent was unable to work and [the] Petitioner contributed more, but since late 2014, which includes the period after this proceeding was initiated, he has contributed nothing toward the mortgage payments or the upkeep of the house."

15

¶ 42　As to the petitioner's notice of intent to claim dissipation, the court found as follows with regard to the alleged timing of the dissipation:

> "The notice states in section I(2) that the irretrievable breakdown occurred because the '[respondent] kept the fact that she had settled her lawsuit secret from [the petitioner], and by her own admission eventually converted the vast majority of the net settlement of $572,785.95 that she received in January 9, 2014 in cash…' This is not a definitive statement and does not satisfy the requirements of the statute. Later in that same paragraph, [the petitioner] alleges a subsequent argument concerning the settlement and that the parties separated after [the] Respondent obtained an order of protection on December 11, 2014, and that the parties lived separate and apart after that. This is a sufficient statement of a date on which the marriage began undergoing an irretrievable breakdown.
> ＊ ＊ ＊
> [The] Petitioner presented no evidence of when the irretrievable breakdown of the marriage began. The Court can take notice, however, of the date of the entry of the emergency order of protection in Jackson County case 14-OP-124, which occurred on December 11, 2014. For purposes of determining whether dissipation occurred, the Court finds that the irreconcilable breakdown of the marriage began on that date.
> Based upon the evidence, the court finds that the personal injury settlement received by [the] Respondent on January 9, 2014, is marital property."

The court determined that the respondent dissipated a total amount of $35,103.94.

¶ 43　On December 12, 2018, the trial court entered an order granting the petitioner's motion for sanctions and entered judgment in the amount of $670.32.

¶ 44　　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 45　The petitioner raises six arguments on appeal. First, he argues that the trial court failed to provide a just and equitable division of the marital property. A court's division of marital property will be upheld absent a clear abuse of discretion. *In re Marriage of Stone*, 155 Ill. App. 3d 62, 205 (1987). An abuse of discretion occurs where "no reasonable person would take the view adopted by the trial court." *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 650 (2008). The individual factual findings of the court upon which the final

16

division is based will be reversed only if the findings are against the manifest weight of the evidence. *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 205 (2005). A finding is against the manifest weight of the evidence if "the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *Heroy*, 385 Ill. App. 3d at 663 (citing *In re Marriage of Matchen*, 372 Ill. App. 3d 937, 946 (2007)).

¶ 46    The petitioner argues that there was no "competent" evidence as to the value of the properties presented to the trial court. However, the respondent testified at great length as to her premarital assets and the costs associated with upkeep of the Ash property. After hearing the evidence, the court based its decision on the future earning potential of the parties, their ages and expected future wages, and the respondent's permanent disability. Based on the monthly income of the parties, the fact that the respondent is permanently disabled, and the petitioner's current monthly income compared to the respondent, we cannot say that the court's findings of fact were against the manifest weight of the evidence. Furthermore, based on the court's reasoning, we cannot say that its division of marital assets was an abuse of discretion.

¶ 47    Next the petitioner argues that the trial court abused its discretion in its calculation of dissipated assets. Dissipation refers to "the 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' " *In re Marriage of Seversen*, 228 Ill. App. 3d 820, 824 (1992) (quoting *In re Marriage of O'Neill*, 138 Ill. 2d 487, 497 (1990)).

¶ 48    Here, it is undisputed that the respondent dissipated $35,103.94 of marital assets. The petitioner, however, argues that this number is far too low as there is over $150,000 of settlement funds that have yet to be accounted for.  Though we agree with the petitioner that there is unaccounted for funds from the settlement, he presented no evidence that the respondent used those funds for her sole benefit after the start of the irreconcilable breakdown.  The timing of the use of the marital funds is an important hurdle that the petitioner fails to overcome.  Therefore, we cannot say that the trial court's finding that the respondent dissipated $35,103.94 of marital funds is an abuse of discretion.

¶ 49    Next, the petitioner argues that the trial court awarding him the Morber property was error because it belongs to a third party and thus is not subject to the court's jurisdiction in this case.  We need not address this point as the parties stipulated during the trial that the Morber property was purchased with the respondent's settlement money, that she owned it in Shirley McCoy's name, and that it was a marital asset.

¶ 50    "A stipulation is an agreement between parties or their attorneys with respect to the business before the court, and, generally, matters which have been stipulated to by the parties cannot be disputed on appeal." *In re Marriage of Galen*, 157 Ill. App. 3d 341, 344 (1987).  There is no specific form that a stipulation must take.  *Id*.  However, it "must be clear, certain, and definite in its material provisions, and it is essential that it be assented to by the parties or those representing them." *Id*.  The stipulation made on the record during trial was clear and certain, and therefore cannot be disputed on appeal.

¶ 51    Next, the petitioner argues that the trial court erred in its division of assets because it awarded the respondent funds that she dissipated.  However, it is clear from the court's

docket order that mathematically, it must "award" dissipated money to the person who wrongfully spent it because it offsets that party's award. By doing so, the party's award is offset by the amount they dissipated. Therefore, the court did not err in "awarding" the dissipated funds to the respondent to reduce the amount of her total award.

¶ 52    Next the petitioner argues that the trial court failed to put him in a position where he could begin anew because the court failed to account for the earning potential of the respondent's property via rental tenants, and it overvalued his potential earning capacity. We disagree.

¶ 53    A trial court's dispositional order that is entered upon dissolution of a marriage must be equitable. *In re Marriage of Calisoff*, 176 Ill. App. 3d 721, 725 (1988). "An important objective to be reached by the trial court in entering such an order is to place the parties in a position from which they can begin anew, in addition to providing adequate support for the children." *Id*. at 726. The court's decision will not be disturbed absent an abuse of discretion. *Id*.

¶ 54    Section 503(d)(8) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d)(8) (West 2018)) allows a court, in dividing marital property, to consider the "the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties." The Act further allows the court to consider "the reasonable opportunity of each spouse for future acquisition of capital assets and income." *Id.* § 503(d)(11).

¶ 55    Here, we cannot find that the trial court erred in considering these factors and thus its findings were not an abuse of discretion. The evidence established that the petitioner

19

was already receiving $1639.54 more in income than the respondent each month from his pension. There was also no evidence presented that the respondent had ever actually received rent from the tenants that resided on her property. Therefore, we cannot say that the court abused its discretion in its division of the property.

¶ 56    Lastly, the petitioner argues that the trial court erred in its award of attorney fees. The court awarded sanctions against the respondent and in favor of the petitioner in the amount of $670.32. A court's award of sanctions will not be disturbed absent an abuse of discretion. *Hartnett v. Stack*, 241 Ill. App. 3d 157, 172 (1993). Here, the court found that had the respondent been truthful with regards to her ownership of the Morber property, McCoy's deposition would have been unnecessary. The court therefore sanctioned the respondent in the amount of the additional cost of the deposition. Nothing else in the record indicates that the petitioner incurred additional cost due to the respondent's misconduct. Therefore, we cannot say that the court's determination was an abuse of discretion.

¶ 57                              III. CONCLUSION

¶ 58    For the foregoing reasons, the orders of the circuit court of Jackson County are hereby affirmed.


¶ 59    Affirmed.